THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE STATE BOARD OF CHARITIES, Respondent, *v.* THE NEW YORK SOCIETY FOR THE PREVENTION OF CRUELTY TO CHILDREN, Appellant.

1. CORPORATIONS — WHEN CHARITABLE IN NATURE — CAPACITY TO TAKE CHARITABLE GIFTS. The capacity of a corporation to take and administer charitable gifts does not imply that the corporation must necessarily be of a charitable nature.

2. EXEMPTION FROM TAXATION AS INDICATION OF CHARITABLE NATURE OF CORPORATION. The exemption from taxation given by chapter 553 of the Laws of 1890 to societies for the prevention of cruelty to children does not show that the New York Society for the Prevention of Cruelty to Children is of the class designated as charitable, since charitable institutions were already exempt, and the statute was not necessary if this corporation belonged to that class, and, moreover, exemption from taxation is a privilege frequently conferred by the legislature upon corporations with no charitable features whatever.

3. CORPORATION RECEIVING MONEY FROM CITY TREASURY. In receiving and disbursing the money which is annually given from the city treasury to the New York Society for the Prevention of Cruelty to Children that corporation does not receive or administer any charity, but only takes an allowance from the city for doing work that otherwise would devolve on the police department.

4. NEW YORK SOCIETY FOR THE PREVENTION OF CRUELTY TO CHILDREN — PURPOSE AND CHARACTER OF — NOT SUBJECT TO VISITATION BY STATE BOARD OF CHARITIES. The New York Society for the Prevention of Cruelty to Children, organized under chapter 130 of the Laws of 1875, for the prevention of cruelty to children and the enforcement by all lawful means of the laws relating to or in anywise affecting children, is not a charitable institution within the scope of sections 11 to 14 of article 8 of the Constitution, chapter 771 of the Laws of 1895 and chapter 546 of the Laws of 1896, giving to the state board of charities the right of visitation with respect to all charitable institutions, since it receives no public money for charitable uses and administers no charity in any legal sense, but exists for the sole purpose of enforcing the criminal laws to prevent cruelty to children, although the corporation, as a mere incident of its work, feeds, clothes and cares for children temporarily while detained as witnesses or victims of cruelty pending the prosecution of the offenders in the courts.

5. STATE SUPERVISION OF CHARITABLE INSTITUTIONS — EXTENT OF. The scheme of state supervision of charitable institutions under the Constitution and statutes was not intended to apply to every institution

engaged in some good or commendable work for the relief of humanity
from some of the various ills with which it is afflicted, but only to those
corporations, public or private, maintained in whole or in part by the
state, or some of its political divisions, through which charity, as such, is
dispensed by public authority to those having a claim upon the generosity
or bounty of the state.

*People ex rel. State Bd. of Charities* v. *N. Y. Society for Prevention of
Cruelty to Children*, 42 App. Div. 83, reversed.

(Argued November 21, 1899; decided January 9, 1900.)

APPEAL from an order of the Appellate Division of the
Supreme Court in the first judicial department, entered July
7, 1899, affirming in part and reversing in part an order of
Special Term granting a peremptory writ of mandamus.

The facts, so far as material, are stated in the opinions.

*David B. Hill* for appellant. The society is not a "chari-
table" institution within the meaning of the Constitution and
laws. The true character of a corporation must necessarily
be determined by its charter. (*N. Y. F. Ins. Co.* v. *Ely*, 2
Cow. 678; *Jemison* v. *C. S. Bank*, 122 N. Y. 135; *People
ex rel.* v. *U. Ins. Co.*, 15 Johns. 357; *Brisay* v. *Star Co.*, 13
Misc. Rep. 349; 7 Am. & Eng. Ency. of Law [2d ed.],
695; *Perrine* v. *C. & D. C. Co.*, 9 How. [U. S.] 172; *Bank
of Augusta* v. *Earle*, 13 Pet. 519; *State v. Ehrmantrout*,
63 Minn. 104; *Steinway* v. *Steinway & Sons*, 17 Misc. Rep.
43; L. 1875, ch. 130; *Regents, etc.*, v. *Williams*, 9 G. & J.
388.) The constitutional authority of the legislature, to con-
fer upon the society the powers which it has granted to it, is
beyond question. (Const. art. 8, § 1; *People ex rel.* v. *Squire*,
107 N. Y. 593; *Perkins* v. *Heert*, 158 N. Y. 306; *People* v.
*Dunn*, 157 N. Y. 528; *Kittinger* v. *B. T. Co.*, 160 N. Y.
377; *People* v. *N. R. S. R. Co.*, 121 N. Y. 621.) The
society is a *quasi* public corporation, of a public-spirited
and humane character. (*People* v. *Morris*, 13 Wend. 334;
7 Am. & Eng. Ency. of Law [2d ed.], 637; *M. D. Co.* v. *Zeller-
bach*, 99 Am. Dec. 300; *Railroad Comrs.* v. *P. & O. C. R. Co.*,
18 Am. Rep. 211; *Foster* v. *Fowler*, 60 Penn. St. 27;

*Inhabitants of Rumford* v. *Wood*, 13 Mass. 197; *Grant* v. *Fancher*, 5 Cow. 309; *Seneca Nation* v. *John*, 16 N. Y. Supp. 40.) The legislature has always very carefully avoided treating corporations for the prevention of cruelty as "charities," or bringing them as such within the jurisdiction of the state board. (*Catlin* v. *Trustees, etc.*, 113 N. Y. 133; *Matter of Eilers*, 9 N. Y. L. J. 1127; *Hollis* v. *D. T. Seminary*, 95 N. Y. 166.) The society is not subject to the visitation, inspection and supervision of the state board of charities, simply because it is an "institution." It must also be "of a charitable, eleemosynary, reformatory or correctional character." (Const. N. Y. art. 8, § 11; *People ex rel.* v. *Comptroller*, 152 N. Y. 404; *People ex rel.* v. *Fitch*, 154 N. Y. 33.) The details of the work prosecuted by the society clearly show that it is not in any sense of a "charitable, eleemosynary, correctional or reformatory character," within the intent and meaning of the provisions of the Constitution and statutes referred to. (L. 1895, ch. 559, § 72; Penal Code, § 291, subd. 6; *H. M. L. Ins. Co.* v. *Weed*, 28 Conn. 63.) The legal status of the society is not affected by the alleged admissions of its officials or the hearsay declarations of others. No estoppel can be predicated on such matters against its present contention. (*Brewster* v. *Striker*, 2 N. Y. 19; *Martin* v. *Angell*, 7 Barb. 407; *Keen* v. *Coleman*, 39 Penn. St. 299.) If the proper construction is that the state board has no jurisdiction over private institutions unless they receive public funds for the "maintenance and support" of the inmates thereof, then it has no jurisdiction over this society. (L. 1895, ch. 559, § 72; *Cowley* v. *People*, 21 Hun, 415; 83 N. Y. 464.) An application for a writ of mandamus is addressed to the sound discretion of the court. In so far as the Special Term refused the mandamus, its order will not be reviewed here. (*Matter of Hart*, 159 N. Y. 280; *People ex rel.* v. *Van Wyck*, 157 N. Y. 495; *People ex rel.* v. *Jeroloman*, 139 N. Y. 14.) The delay in asserting jurisdiction over this society for over a quarter of a century constitutes *laches*, which is a sufficient ground for the exercise of the discretion of the court in refusing a mandamus.

**236** Peo. ex rel. Bd. Charities *v.* N. Y. Soc. P. C. C. [Jan.,

Points of counsel. [Vol. 161.

(*People* v. *Suprs. of Ulster Co.*, 16 Johns. 59; *People ex rel.* v. *Board of Education*, 20 App. Div. 452; *People ex rel.* v. *Justices*, 78 Hun, 334; *People ex rel.* v. *Collis*, 6 App. Div. 467; Code Civ. Pro. § 414; *People ex rel.* v. *Preston*, 62 Hun, 189.)

*John C. Davies*, Attorney-General (*Theodore E. Hancock* of counsel), for respondent. There is nothing ambiguous in the constitutional and statutory provisions relating to the powers and duties of the state board of charities. The law should not be so construed as to make nugatory the purpose and intent of the Constitution or the legislative enactments which were intended to uphold and preserve the authority of the state board of charities. (Const. N. Y. art. 8, § 11; L. 1896, ch. 546, § 9; *Humphreys* v. *L. S. of Poor*, 29 Ohio, 201; *People ex rel.* v. *Fitch*, 154 N. Y. 14; *People ex rel.* v. *Comptroller*, 152 N. Y. 399.) The fact that societies for the prevention of cruelty to children have had conferred upon them certain police powers as an incident to their charitable work does not remove them from the category of charitable institutions. (*Fox* v. *M. & H. R. H. Society*, 25 App. Div. 26; *People ex rel.* v. *Fitch*, 154 N. Y. 14; *Ould* v. *Washington Hospital*, 95 U. S. 311; *Going* v. *Emery*, 16 Pick. 119; *Saltonstall* v. *Sanders*, 11 Allen, 446; *University of London* v. *Yarrow*, 1 De G. & J. 72; *Matter of Douglass*, L. R. [35 Ch. Div.] 427; *Matter of Faveaux*, L. R. [2 Ch. 1895] 501; *Armstrong* v. *Reeves*, L. R. [25 Ir. App.] 324.) It was error for the Special Term justice to limit and abridge the visitorial powers of the state board of charities. The board was entitled to an order giving them full access to the grounds, buildings, books and papers relating to the institution, without the restrictions specified in the order of the court. The order of the Appellate Division should be affirmed. (Const. N. Y. art. 8, §§ 11, 13; L. 1867, ch. 951; L. 1873, ch. 571.) The justice who granted the order at Special Term erred in assuming that the provisions of the Penal and Criminal Codes, relating to societies for the prevention of cruelty

to children, in any way modify their status as charitable and eleemosynary institutions, or change their charitable nature or design, or eliminate them to any extent from the visitorial and supervising powers of the state board of charities. (Penal Code, §§ 293, 668; Code Crim. Pro. § 749; *People ex rel.* v. *Strickland,* 13 Abb. [N. C.] 474; *Trustees, etc.,* v. *Roome,* 93 N. Y. 313; *People* v. *Pinckney,* 32 N. Y. 392; *Fox* v. *M. & H. R. H. Society,* 25 App. Div. 26; *People ex rel.* v. *Fitch,* 154 N. Y. 26.) A peremptory writ of mandamus is the proper remedy. The discretion of the court to grant or refuse a writ of mandamus is not absolute, but governed by legal rules and subject to review upon appeal. (*People ex rel.* v. *Chapin,* 104 N. Y. 96; *People ex rel.* v. *Common Council,* 78 N. Y. 56; *People ex rel.* v. *Commissioners,* 149 N. Y. 30; *People ex rel.* v. *Mayor, etc.,* 144 N. Y. 63; *People ex rel.* v. *Schiellein,* 95 N. Y. 125; *People* v. *Halsey,* 37 N. Y. 347; *People* v. *Supervisors of Chenango,* 8 N. Y. 318; *People ex rel.* v. *Trustees,* 21 Hun, 195; *People ex rel.* v. *Nostrand,* 46 N. Y. 380; *People ex rel.* v. *Bd. Suprs.,* 142 N. Y. 271.) The relator is entitled to a peremptory writ of mandamus as the material averments of the moving papers were not put in issue. (*People* v. *R., W. & O. R. R. Co.,* 103 N. Y. 95; *People ex rel.* v. *Supervisor,* 154 N. Y. 388; *Matter of Loftus,* 41 N. Y. S. R. 357; *People ex rel.* v. *Brush,* 146 N. Y. 60.)

O'Brien, J. On the application of the relator, the state board of charities, the courts below have awarded a peremptory mandamus commanding the defendant to permit the relator to visit the buildings and grounds and to inspect the books and papers of the former and to give full information concerning the operations of the society and to comply with the rules and regulations of the board in the management of its corporate affairs. The question presented by this appeal is whether there was power in the courts to award the writ.

The state board of charities asserts that the defendant is sub-

ject to visitation, and to such rules and regulations as that
body may enact for the government of certain corpora-
tions, and the better management of their affairs, and the
defendant denies the existence of any such power. By the
provisions of the Constitution (Art. 8, §§ 11, 14) and the
statutes enacted in pursuance thereof (Laws 1895, chap. 771;
Laws 1896, chap. 546), the right of visitation with respect to
all "charitable institutions," is conferred upon the state
board of charities, with power to enact rules and regulations
for their government and the management of their affairs.
It follows, therefore, that if the defendant is a charitable
institution within the meaning of the Constitution and the
statute, that the writ was properly granted, but if it does not
properly fall within that particular class of corporations, the
board of charities has no jurisdiction over it. The conten-
tion of the defendant is that it does not belong to the class of
corporations subjected by these provisions of law to visitation
and regulation, and, hence, the only question to be considered
is whether the defendant is a charitable institution or corpora-
tion within the meaning of the Constitution and the statute.
On the argument here, and in the discussion in the courts
below, various considerations were urged and discussed that
we think have no legitimate bearing upon this question. It
may be useful to notice them now, since the discussion of any
question of this character will always be advanced by exclud-
ing at the outset all arguments and considerations that are
manifestly irrelevant.

It is said that this corporation, in order to promote the
objects of its incorporation, has been given legal capacity to
take and administer gifts and bequests that would be called
charitable under the statute of Elizabeth and under general
rules of law applicable to trusts, and all that is quite true.
But it is an error to conclude that a corporation must neces-
sarily be of a charitable nature because it has capacity to take
and administer such gifts. A very large class of corporations
may do that without affording the slightest ground for an argu-
ment that they are or must be charitable institutions or cor-

porations.   Colleges, academies and nearly all institutions of learning or of a literary character, and even cities, villages and other municipal corporations, may take and administer such gifts, but that fact cannot in the least affect their true character or convert them into charitable institutions, and, of course, this observation applies to all those receiving voluntary donations as well as bequests properly so called in testamentary instruments.   The fact that the property of this corporation is exempt by statute from taxation only shows that it enjoys a special privilege in common with a great many other corporations that no one can claim to be of a charitable nature. Indeed, the manner in which the exemption was made tends only to show that the lawmakers did not consider the defendant as embraced in the class of corporations designated as charitable, since, if it did, there could be no necessity for enacting the statute of 1890, which gave the exemption to this corporation by name.   Charitable institutions were already exempt, and it is only on the theory that the defendant did not belong to that class that a new and special law was necessary.

The defendant receives under the charter of New York the sum of thirty thousand dollars annually from the city treasury to promote the objects of its organization.   But in receiving and disbursing that sum of money, it neither receives nor administers any charity, but is simply allowed something by the city for doing work that otherwise would devolve, as we shall see hereafter, on the police department, and which the society can do better and with much less expense than the police.   The fact that the president of this corporation and the then mayor of New York, when commending its work to the public, described it as an institution founded on the broadest principles of charity, has no weight in the determination of the question involved in this appeal.   A corporation cannot be classified by what its friends or promoters may say about it, but only from the nature of the powers which it may lawfully exercise and the business in which it is lawfully engaged.   It is manifest, therefore, that in any inquiry concerning the nature, character or clas-

sification of any particular corporation, the only safe guide is the charter or law of its creation prescribing the powers that it may exercise and defining the nature of the business or the duties for which it was created. The defendant was incorporated under a general law enacted for the express purpose of giving to such societies a corporate organization (Laws 1875, chap. 130). This act provided that any five or more persons of full age, a majority of whom shall be citizens of, and residents within, this state, who shall desire to associate themselves together for the purpose of preventing cruelty to children, may become incorporated by making and acknowledging a certificate in which, among other things, the name of the corporation shall be given, with the particular business and objects of the corporation, and filing the same in the proper county clerk's office and in the office of the secretary of state, after having first procured the written consent of a justice of the Supreme Court to the incorporation. The certificate of the founders of this corporation was filed April 27, 1875. The name selected was that which the defendant now bears and the objects of the corporation are stated in the following words: "The particular business and objects of this society are the prevention of cruelty to children and the enforcement by all lawful means of the laws relating to or in anywise affecting children."

This corporation was, therefore, created for the purpose of enforcing laws enacted to prevent cruelty to children, and that is the only object or purpose of its existence. The means by which it is enabled to fulfill the purpose of its creation were also provided in the law of its creation, and are there stated as follows: "Sec. 3. Any society so incorporated may prefer a complaint before any court or magistrate having jurisdiction for the violation of any law relating to or affecting children, and may aid in bringing the facts before such court or magistrate in any proceeding taken. Sec. 4. All magistrates, constables, sheriffs and officers of police shall, as occasion may require, aid the society so incorporated, its officers, members and agents in the enforcement of all laws

which now are or may hereafter be enacted, relating to or affecting children." The powers and functions of the corporation have been enlarged from time to time by additional statutes that operate as amendments to the general law under which it was formed, and these statutes, or most of them, are found in the Criminal Code. (Code Crim. Pro. §§ 292, 749, 154; Laws 1888, chap. 490; Penal Code, § 293.) The learned judge who gave the opinion below summarized in clear and concise language the various and extensive powers and functions that this corporation may exercise under these statutes substantially as follows: "The society receives on commitment, upon and subject to the order of the court, all children charged with the commission of crime in the county of New York who, otherwise, would be sent to the city prison; that it also receives temporarily, upon the order of a court, children who are the victims of physical violence in the county, or who are held as witnesses there pending the criminal prosecution of an offender; that it has authority to receive under commitment to itself, at its own expense, children under the age of sixteen — an authority which, however, is but rarely exercised; that the children so committed are retained temporarily and, as soon as circumstances permit, transferred to other institutions. While thus temporarily retained, they are properly cared for. Isolating rooms are provided for those who suffer from contagious disease, and a skilled nurse is always in attendance, who enforces every ordinance of the board of health and every suggestion of the society's physicians relative to the health of the children. The society also receives and takes to court, without delay, children found in a state of destitution, for disposition by the court as prescribed by the statute. It maintains two officers in every police court, who, upon the order of the magistrate, investigate applications for the commitment of the children and make written reports in regard thereto for the information of the magistrate. It receives the money which parents are required, under the orders of a magistrate, to appropriate from their weekly earnings to the support of committed children, and it pays these moneys over to the comptroller. If

these moneys are not paid, it compels their payment by prosecution. It defends in the courts the custody of children committed to institutions through its instrumentality; prepares briefs for the district attorney's office in cases of cruelty where an indictment has been found; secures the attendance of witnesses, and assists the district attorney in the procuring and preservation of evidence. \* \* \* We quite agree with the society that the furnishing temporarily of shelter, food, clothing and medical attendance are incidental to its main purpose. The test of its character is undoubtedly the objects which it seeks to attain as specified in the law of its being and — following that law — in its certificate of incorporation. (*Fire Ins. Patrol* v. *Boyd*, 120 Penn. St. 624.)" The learned court then proceeded to show that all these things were charitable acts, and, hence, that the defendant was a charitable institution. It is at this point in the reasoning process that we are constrained to differ from the learned court below. It is very clear that this corporation was created and exists for the sole purpose of enforcing the criminal laws to prevent cruelty to children, and can be called a charitable institution only in the same sense that the term would apply to any other corporation organized to aid in the enforcement of any other branch of the criminal law. All the things that it does or can do would naturally and primarily devolve upon the police department, and the society exists only because it can do the work of the police more efficiently than they can. The mind does not naturally or readily accept the assertion that a corporation possessing only such functions is a charitable institution in any fair or proper sense, and it is only by refined and elaborate argument that the first and most natural impression can be removed. Some of these arguments have been already noticed, and I have attempted to point out their true weight and proper value, but the one which embodies the fundamental error pervading the whole discussion remains to be considered.

In a very broad and general sense it may doubtless be said that any individual or corporation that does anything to avert

or alleviate human misery or human suffering in any of their
varied forms without gain or reward is engaged in a work of
charity.    All good works of this description generally proceed
from motives of charity, and it is in that sense only that the
defendant can with any propriety be called a charitable insti-
tution.    But it is obvious that upon an inquiry with respect to
the true legal meaning of a charitable institution, as that term
is used in the Constitution and the statutes, that line of argu-
ment is misleading and fallacious, since it proves altogether too
much.    It would embrace a great variety of corporations that
have never been and are not now classed as charitable in any
legal sense.    It would include all organizations of a religious or
benevolent character, all educational institutions and all fra-
ternal societies like the Masons and Odd Fellows, since they
all possess some feature that might be called charitable.    It
would include every society for the prevention of crime, or
for the promotion of temperance, the elevation of the condi-
tion of the Indians or the colored people in the south, and even
societies formed to mitigate the calamities of war and to pro-
mote peace.    Surely we cannot impute to the framers of the
Constitution and the statute an intention to use terms in
such a vague and general sense.    Reasonable certainty is a
quality that we are accustomed to ascribe to all laws and
especially to constitutional or statutory enactments.    Rules
of human action expressed in vague language and rendered
still more uncertain by loose interpretation are frequently,
in a measure, quite as mischievous and oppressive as
those ancient edicts which, it is said, were purposely placed
so high in the air that the people were unable to read or
understand them.    The charitable institutions referred to in
the Constitution and the statute are those that have long been
known and recognized as such by legislators and other officers
engaged in the administration of the state government.    The
visitorial power of the state board of charities over such insti-
tutions is not new.    It was conferred by the same act which
created the board (Laws 1867, chap. 751, as amended by
Laws 1873, chap. 571).    The present Constitution added

nothing to these powers, except. the right to make rules for the government of such institutions as were subject to visitation. If the defendant is a charitable institution, subject to such visitation, it has been such for nearly a quarter of a century, since the day of its creation.

The powers of the board over charitable institutions originated in the abuses supposed to exist in the appropriation and expenditure of public money for charitable purposes. Therein is to be found the reason of the law, and it is safe enough to assume that a corporation that does not fall within the reason of the enactment is not a charitable institution, even though engaged in a good and laudable work without gain or reward. The board was empowered to deal with charitable institutions, not in the broad and general sense to which I have referred, but in the more limited and restricted sense in which these terms are used in the Constitution and the statute. The scheme of state supervision was not intended to apply to every institution engaged in some good or commendable work for the relief of humanity from some of the various ills with which it is afflicted, but only to those maintained in whole or in part by the state or some of its political divisions through which charity, as such, was dispensed by public authority to those having a claim upon the generosity or bounty of the state. These are the only institutions that are within the reason or policy of the law, and when thus limited and restricted there is still ample scope for its application. It will apply to all institutions, public or private, that give public pecuniary relief in that form commonly called charity when we refer to the administration of government, and it will exclude only those institutions that ask nothing in the form of charity from the state though they may be engaged in some good work in their own way that might be called charitable in the sense that it is unselfish and voluntarily assumed.

There is such a plain distinction between the charity which the state dispenses by statute, and that which is voluntarily extended by private benevolence, either through individuals or societies with a corporate organization, that there will be

1900.] Peo. ex rel. Bd. Charities v. N. Y. Soc. P. C. C.  245

N. Y. Rep.]          Opinion per O'Brien, J.

little practical difficulty in fixing the limits of supervision by
the state board of charities.   There are numerous incorpo-
rated missionary societies in this state that in a large sense
might be called charitable institutions, since the object of
their creation and existence is the dissemination of religious
ideas, not only at home but throughout the world, even in
regions the most remote.   They are maintained by private
bequests, voluntary donations and collections made in the
various churches.   They have legal capacity to receive and
administer all such gifts, as we know from the very frequent
controversies that come before us concerning the validity of
such bequests in wills.   But no one, I think, will contend
that the state-board of charities has any right to an inspection
of the books and papers of these corporations, or to make
rules for the transaction of their business, for the obvious
reason that they are not the charitable institutions that
come within the purview of the Constitution or the stat-
utes.   The charity with which the state is concerned is
something quite different.   That consists in the distribu-
tion of relief or public aid, the fruit of taxation levied
alike upon the willing and the unwilling.   The right of
visitation and regulation applies only to those institutions,
public or private, through which the state fulfills this
function.   They alone are within the reason of the law,
and, consequently, within its scope and operation.   One of
the most familiar rules of statutory construction is that gen-
eral words must be limited to the particular purpose or end
which the lawmakers had in view.   They must be understood
and applied in the special sense in which they are used by leg-
islators.   What may be called governmental charity, or char-
ity based upon public taxation and administered by a system
of statute law, is a very different thing from the charity that
moved the good samaritan and prompted the widow's mite.
The power of visitation and regulation applies to those insti-
tutions administering charity of the former kind in whole or
in part, but not to those voluntarily engaged in some good
work of the latter character.   They are left by the state to

manage their own affairs in their own way, or, at all events, are not within the jurisdiction of the state board of charities. That jurisdiction can then be defined by the application of a very just and simple test. If the particular institution, whether public or private, receives public money for use or distribution *as charity* and not for some other reason or some other purpose, that institution is subject to visitation by the board, but this system of state supervision does not extend to the efforts of private benevolence. That may flow in various channels not subject to state regulation, since the government is in no way concerned with it.

If the thirty thousand dollars which the defendant receives from the city could in any proper or legal sense be called charity, there might be some foundation for the claim that it is within the jurisdiction of the board, although that sum is but a very small part of the annual expenses. But obviously it is not paid or received as a charitable contribution. The state in its political divisions expends large sums of money to prevent or punish crime, including the crime of cruelty to children. No one can very well claim that those moneys, expended in the enforcement of the criminal law, are paid for charity, and yet that is the very purpose for which the city contributes this money to the defendant, and, hence, it cannot give to the corporation the character of a charitable institution any more than it could to the police department when expended there for services of a similar kind. The defendant receives no public money for charitable uses, and administers no charity in any legal sense. The fact that it feeds, clothes and cares for children temporarily, while detained as witnesses or victims of cruelty pending the prosecution of the offenders in the courts, is admitted to be but an incident of its main purpose and character. The place where the children are thus temporarily maintained could more properly be classified as a house of detention than as a charitable institution. The main reasons in the court below for the decision were based upon the English cases defining what were considered bequests or gifts for charitable uses. That

argument has been already noticed. It is only necessary to add that if we were to hold that every corporation with capacity to take and administer such a gift or bequest is a charitable institution within the meaning of the Constitution and the statute, we would have to include a great number of corporations whose objects are entirely foreign to any work of charity, even in the broadest sense. Capacity to take a bequest proceeding from charitable motives is no real test of the class to which the corporation taking it belongs.

The power to make rules for the government of a corporation implies the right to participate in its management in some degree at least. It is difficult to see how the efficiency of the one now in question can be promoted by dividing its powers and functions between its regular officers and a central board at the capital of the state. In order to properly discharge the peculiar functions conferred by the law of its creation, the defendant must act promptly and summarily, not by written rules, but according to the circumstances of every case. It is engaged in the stern task of making war upon crime and vice in peculiar forms, and it would be just as impracticable to interfere by hard and fast rules with freedom of action as it would be to plan the details of a military campaign in the cabinet instead of trusting to the judgment and discretion of the commanding officer in the field. The legislature evidently understood that corporations of this character are not subject to the jurisdiction of the state board of charities since it has provided that they are subject to visitation by the Supreme Court, and it appears that this power has been exercised with respect to this particular corporation. (Laws 1899, chap. 360.) It is scarcely conceivable that it was intended to subject the defendant to two distinct and different methods of state supervision.

There is nothing in these views that conflicts with the decision of the court in the case of *People ex rel. New York Institution for the Blind* v. *Fitch* (154 N. Y. 14). It was held in that case that the word " charitable," as used in the Constitution and the statute, conferring the powers referred to upon

248  Peo. ex rel. Bd. Charities v. N. Y. Soc. P. C. C.  [Jan.,

Opinion per Parker, Ch. J.  [Vol. 161.

the state board of charities, was to be given only its usual and ordinary meaning. Within that definition a corporation, created and existing to aid in the enforcement of the criminal law to prevent cruelty to children, cannot be held to be a charitable institution. That case decided that the institution then involved was partly educational and partly charitable, and that so far as it was engaged in educating, clothing and maintaining blind children who were indigent, it was a charitable institution, but was not such as to the children who paid for their own tuition. The real question in that case was whether any of the inmates of the institution could properly be called indigent, in view of the fact that they were selected and placed there by the state without regard to their circumstances, and whether the clothing and maintenance were not merely incidental to the purpose of education. There is such a wide difference between an institution for maintaining indigent blind children and a corporation created to aid in the enforcement of the criminal law to prevent cruelty to children that both cannot be placed in the same class.

The order of the Appellate Division and the Special Term should be reversed and the application denied, with costs in all courts to the defendant.

Parker, Ch. J.: That the question up for decision is a fairly debatable one is demonstrated by the several opinions that have been written in this court and the court below. The strength of the argument seems to me to be on the side that denies to the state board of charities the right of visitation and to make rules and regulations for the government of this defendant, and it is fully presented in the opinion of Judge O'Brien and the concurring memorandum of Judge Gray.

But if, after weighing the arguments *pro* and *con*, a doubt remained I should resolve that doubt against the claim of power asserted by the state board of charities.

If the legislature, from which this relator originally obtained the power, which has recently been incorporated in the Constitution, but on no broader lines than the legislative

grants of authority, deems it wise to give to the relator the right of visitation and to make rules and regulations for this defendant, it can do so. And if later experience shows that the power is being exercised unwisely and to the serious detriment of a great public work, its grant of authority can be revoked. Neither the Constitution nor the statutes have undertaken to give a definition of a charitable institution or corporation. That has been left to the courts, and if the definition of the courts be not broad enough to include as many institutions and corporations as the legislature deems advisable, it can by further enactment bring in such others, or indeed every institution, corporation, society or association having for its purpose the promotion of the public welfare, whether their object be the enforcement of laws for the protection of children, the prevention of cruelty to animals or the accumulation of funds and their application for the purpose of foreign and domestic missions. But the courts should refuse by a strained and doubtful construction of the Constitution to fasten upon all engaged in work helpful in some way to others a regulating authority that even the legislature cannot relieve against, should it after a time grow arrogant from a long use of power, unrestrained by the legislative and executive departments of the state government.

Gray, J. If I could entertain a reasonable doubt upon the question of the power claimed by the state board of charities in this matter, I should be disposed to resolve it in its favor; because, as a constitutional body, invested with power to visit and regulate those institutions of the state which, being of a "charitable, eleemosynary, correctional or reformatory character," expend the public moneys in pursuing their corporate purposes, it is right that every just and fair concession should be made to its claim of power. It was intended to accomplish, as it does, a politic and useful work in preventing and correcting abuses in the administration of charitable and reformatory institutions. But I am convinced, after a careful consideration of the chartered purposes of the Society for the Prevention of Cruelty to Children, and notwithstanding the

32

250 Peo. ex rel. Bd. Charities *v.* N. Y. Soc. P. C. C. [Jan.,

Opinion per Gray, J. [Vol. 161.

.remarkably able discussion at the Appellate Division, that the society cannot be classified among those institutions which are placed under the authority of the state board of charities. Of course, if it is subject to that authority, it must be by reason of its being a charitable institution, and I cannot but believe that such a view is influenced by the idea that as it administers and performs a governmental work, which is, necessarily, humanitarian in its results, it is, therefore, to be regarded as an institution of a charitable character within the statutory sense.

Charity, as a broad idea, underlies and prompts most, if not all, of the work which is undertaken with the object of bettering the condition of human beings. In these days of active philanthrophy, the administration of government has been largely influenced by the desire of improving the social condition of the commonwealth. But it is, in my opinion, incorrect to assert that an agency, which has been created to enforce the laws of the state for the prevention of cruelty to children, is a charitable institution. This society is only charitable in the general concept of human duties and not in the political sense. The statutory intent was to provide an independent and effective means of enforcing certain provisions of the criminal law and the intent is effectuated through the creation of a corporate body, whose sole undertaking is directed to that work. The Penal Code invests it with certain duties with reference to the laws relating to children and empowers its officers and agents to arrest offenders against the law and to bring them before magistrates. Police powers are given to it and it is, in effect, a prosecuting agent of the state with respect to its laws. The corporation may prefer complaints in court and magistrates and officers are required to aid it in the enforcement of all laws relating to children. Such charitable work as it does, in the general sense, is merely incidental and transitory in the temporary care of such children as, for the time being, while the society is enforcing the law in particular cases, are detained in its custody. They, perforce, must be detained as witnesses to, or subjects of, an offense and, therefore,

must be cared for in body, and moneys are expended in doing so. But that incidental work does not characterize the corporate existence and functions as charitable in the legal sense. We must refer for that characterization to the charter, which is the map of its corporate life and which prescribes what functions it may lawfully exercise. The certificate of incorporation states that its objects are " the prevention of cruelty to children and the enforcement, by all lawful means, of the laws relating to, or in anywise affecting, children." Its corporate function is to prosecute offenders against those laws in the courts and the public moneys are paid to it to enable it to execute that corporate function. If the society is enabled by private aid to care for the children in its custody, by feeding and clothing them, that is a purely incidental work.

I do not think that the question of whether the institution is a charitable one, in the legal, or statutory, sense, is to be determined upon the theory which found acceptance below, that its appellation conclusively establishes its charitable purpose, and that its objects are inherently charitable. To reason from the fact that its work is inherently charitable, because bettering the condition of children through the enforcement of the laws against their cruel treatment or neglect, that it is, therefore, to be classified with the charitable institutions, which the Constitution subjects to the visitorial powers of the state board of charities, does not seem to me to be a scientific conclusion. That it is an " institution " of the state is not of itself sufficient to authorize the state board to claim the right of visitation; for the Constitution only confers that right where the institution is of a charitable character. That services are gratuitously rendered is not a reason for denominating it as a charitable institution; for there are other corporations and there are governmental departments, where the services are, also, gratuitously performed and yet they are not and could not, in a proper sense, be termed charitable institutions. Its objects are philanthropic; but so are those of other corporations, which are not regarded as charitable institutions. The chartered function of the society is the enforcement of provis-

ions of the criminal law and it is, for every practical purpose, a *quasi* public corporation, authorized for the greater convenience and certainty of accomplishing that governmental work.

Nor does it appear that the legislature has classified this society as among the charitable institutions of the state. It has, in various enactments, separately classified the society; giving it a distinct place from those institutions which, being of a charitable, eleemosynary, correctional, or reformatory nature, are made subject to the authority of the state board.

For these reasons, as for those expressed by Judge O'BRIEN more fully, I have reached the conclusion that the Society for the Prevention of Cruelty to Children is not subject, under the Constitution, or the laws of this state, to the control or visitation of the state board of charities.

MARTIN, J. (dissenting).   The papers upon which this application was made, after stating in a general way the provisions of the Constitution and laws of the state relating to the powers and duties of the state board of charities, the incorporation of the defendant and its particular business and objects as stated in its articles of association, set forth in part the various annual reports which were made by its officers, which disclose that in 1875 the defendant received donations amounting to $4,965; that in 1876 its donations amounted to $3,735; that in 1877 it received various donations and subscriptions amounting to several thousand dollars, also numerous contributions of clothing by charitably disposed people; that in 1878 it received numerous contributions from members of the society as well as from those who were not members, including one bequest of ten thousand dollars, and that two hundred and eighty-six children were temporarily relieved by the society; that in 1879 two hundred and ninety-seven children had been temporarily relieved and supplied with clothing, and that large sums of money had been contributed by its members and others and that numerous donations of children's clothing were received during that year.

In the report of 1880, its president described the needs and necessities of the society for a permanent building in which to do its work, stated that the sum of twenty-five thousand dollars was needed, and the board of directors referred to the purchase of a permanent building at an expense of forty-three thousand dollars. It then stated that the society was never closed, the manner in which the building was fitted up affording accommodations and appliances for cleansing the children who were received from various dens of misery, and who were furnished with proper food, shelter and care during the brief period required for their permanent location in other institutions. Included in its expenses for that year were items for board of children in the care of the society pending disposition by the court, and temporary relief to starving families. Its subscriptions amounted to $13,395, besides many donations of money and clothing.

The annual report for 1881 was to the effect that the defendant received by way of donations and subscriptions over nine thousand dollars, exclusive of dues of members, and also many donations of children's clothing. In the report for that year, the president explained the work carried on by the society in the following language : " Miserable little creatures are brought in at all hours from the streets ; their garments, saturated with filth and vermin, are promptly removed and destroyed ; they are thoroughly washed and cleansed in a lavatory provided for that purpose, and then dressed in clean clothes and fed, if hungry, with a substantial meal ; they are at night, perhaps for the first time in their lives, placed in comfortable beds. In the morning they are taken before the proper court for disposition, and their places are soon filled by others. This is the practical every day and night work of the society. It is non-sensational, but none the less substantial." The report of the superintendent for that year disclosed that there had been during the year sheltered, fed and clothed in the society's reception rooms three hundred and fifty-one children, at an average cost of more than two dollars

for each child, and that temporary aid had been extended to a number of destitute families and their children.

The report for 1882 states that three hundred and forty-five children were cared for and clothed in the society's room for that year, at an expense for board and clothing of $1,160.21; that $129.38 was expended for temporary relief to starving families, and that upwards of thirteen thousand dollars was received by donations, subscriptions and dues of members for that year.

In the report for the year 1883, the defendant's president, among other things, says: "Charitably-disposed persons are often perplexed how they can best expend money with the prospect of doing the most good." Then, after stating what was required to become a member of the defendant society, he added: "The rescue of children involves the broadest principles of charity, and those who uphold the society strengthen the hand which accomplished the result." The chairman of the board of directors in this report says: "It is one of the peculiarities of this institution that its doors are always open and no child in the city, either male or female, has ever been turned away without shelter for the night. * * * The public should bear in mind that the usefulness of this institution is limited only by the amount of pecuniary assistance given it." This report also shows that during the years 1881, 1882 and 1883 one thousand one hundred and twenty-four children were sheltered and clothed; that ten thousand one hundred and seventy-two meals were furnished them, and that upwards of seventeen thousand dollars was received in 1883 by donations, subscriptions and dues of members.

The report of 1884 shows that over seven hundred children were sheltered during the last year; that $13,200.34 was received by donations, subscriptions and dues of members; and that legacies amounting to upwards of eighteen thousand dollars in addition were paid to the society.

The reports for 1885 to 1897, inclusive, show the receipt by the society of many thousands of dollars by way of donations, subscriptions and legacies, and the payment of large sums of

money for board and clothing of children and for relief of starving families.

In 1888 the defendant purchased a house and lot on Twenty-third street for twenty-five thousand dollars, and made alterations to its buildings at an expense of more than eleven thousand dollars.

The report for 1889 contained a statement by its attorney that the defendant had been exempted from the payment of the collateral inheritance tax upon legacies to it, but that in other cases it had been held that it was liable to such tax, and recommended the procurement of a statute to exempt it and other charitable societies.

In 1890 the report of the society shows that a law was enacted (L. 1890, ch. 553) exempting the personal estate of corporations organized for the enforcement of laws relating to children and other charitable corporations from taxation, and provided that the collateral inheritance tax should not apply to any such corporations.

Its report for 1891 disclosed that its indebtedness on its building had been discharged, and donations to enlarge it and sustain the work were urgently solicited. It then described its buildings and the purposes for which they were used, and declared that the money which enabled it to perform this work had been provided by a generous public.

In the report of 1892, the president of the defendant says that, aided by the charitable and humane, without distinction of creed, it soon had a recognized as well as a corporate existence, and that it had been supported theretofore by liberal contributions from the charitable. Among the expenditures for 1892 was the sum of $278,992.65 for the construction and furnishing of its new building.

In the report of 1894, the president makes an appeal to the public, asserting that the society needs large and liberal donations for its support, that it costs much to feed, clothe and care for children, even temporarily, and that it was greatly hoped that the charitably disposed who, on leaving this world, may desire to do something for little children, will remember that in

this institution at least property is carefully looked after by those who give their time and attention to it.  It also shows that twenty thousand dollars was received that year from the city of New York, in addition to over fifty thousand dollars from donations, subscriptions, legacies and dues from members.  In that year there was paid for salaries and wages $32,179.03, and for board and clothing, medical attendance and medicine for children $9,680.40.

In the report for 1895, President Gerry states his views of the relation of the state board of charities to the defendant under the revised Constitution, and its effect upon it, as follows: "The people of the state of New York, by recent amendments to their Constitution, decided that the care and education of children are of paramount importance to the state.  They enlarged the provisions for public education, and also lent strength and force to the numerous institutions conducted by individuals in a corporate form for the care, support, maintenance and reformation of the helpless and vicious.  The state board of charities, composed of eminent individuals from different parts of the state, was invested with extraordinary powers; not simply for the maintenance of these institutions, but to insure the proper care and education of the children intrusted to them.  Entirely unsectarian, conservative in its views and firm in its action when abuses present themselves, there is every reason to believe that this state board will give an impetus to child-saving work which will be felt by the people, the institutions and by the children alike, with most satisfactory results to each."

Section 194 of the Consolidation Act was amended in 1894 so as to compel the board of estimate and apportionment of the city of New York to include in its final estimate the sum of thirty thousand dollars for the uses and purposes of the defendant.  This sum has been paid to the society annually during the years 1895, 1896 and 1897.  The same provision is contained in the present charter of the city of New York. (§ 230.)

In 1896 a special appeal was made by the society for finan-

cial aid and for shoes and clothing for children, in which the president reviews the work of the society and says: " It relies on the voluntary contributions of the public for the support, care and maintenance of the children while temporarily in its custody.  The public has never yet economized in donations to its needs, even when compelled to curtail those to other charities.  With the money so given it feeds the hungry (often the starving), clothes the naked, and no child has ever been refused shelter or gone to bed hungry or uncared for within its walls.  It cares for all the criminal children arrested or awaiting trial.  It is in entire accord with the police, the city magistrates and the other branches of the city government.  Indeed, it has well been termed by the grand jury a valuable adjunct to the latter.  It is unsectarian, non-political, and its one aim is to help the children who are helpless."

The moving papers then assert that the society is a charitable and eleemosynary institution within the meaning of the Constitution and laws, and subject to the visitorial powers of the board of charities ; that the defendant and its officers have refused and still refuse to allow the state board of charities to visit and inspect the institution, and have refused to recognize its rules or to allow it to have access to its grounds, buildings, books and papers.

The defendant, without denying any of the allegations contained in the moving papers, except that it is subject to visitation by the state board of charities, sets forth in great detail its particular work in an affidavit by its secretary and superintendent.  It receives on commitment, subject to the order of the court, all children charged with the commission of crime; receives temporarily, subject to the order of the court, children who are the victims of physical violence or who are held as witnesses pending the criminal prosecution of an offender, and children who are witnesses to offenses.  Children who have been victims of physical violence are furnished medical attendance by a skilled physician, assisted by a competent nurse.  It receives under commitment children under the age of sixteen, who are not retained except temporarily, but who are subsequently

33

placed in proper institutions for their support and maintenance. Isolated rooms are provided for those who may be found to be suffering from any contagious disease, with a skilled nurse in attendance.   It receives and takes to court without delay any children who may be found in a state of destitution, for disposition by the court.   It has a wagon and team which are in charge of its officers or employees, and transports the children to and from the building where the courts are held.   It maintains two officers in every police court who, upon the order of the magistrate, investigate applications for the commitment of children and make reports thereon for the information of the magistrate. It is permitted to receive children upon commitment at its own expense.   When orders are made requiring " pecunious " parents to appropriate a certain portion of their earnings for the support of their children committed at its request to other institutions, the society receives the money and pays it to the comptroller.   In case of disobedience to orders, it enforces them by prosecution.   It advises with various institutions having charge of children as to the circumstances of the families, in the event of application being made for their discharge.   It maintains a complete system of records of children who pass through its hands, which are the subject of reference by the police and city authorities.   It prepares a brief for the district attorney's office where indictments are found, secures the attendance of witnesses and assists the district attorney in procuring and preserving evidence.   It defends the custody of children committed to institutions through its instrumentality.   The thirty thousand dollars a year it receives from the city of New York is applied to the uses and purposes of the society, but not for the support, education, maintenance or care of the children.   It was originally organized by special charter, but is now incorporated under article five of the Membership Corporations Law, and possesses similar powers as to children as are possessed by societies for the prevention of cruelty to animals.

The only question presented by this appeal is whether the state board of charities is authorized and required to visit and

inspect the institution known as the New York Society for the Prevention of Cruelty to Children. To its proper determination a brief reference to the provisions of the Constitution and the statutes relating both to the state board of charities and to the defendant, seems necessary.

The board of state commissioners of public charities was first established by chapter 951, Laws 1867. That act authorized and required the commissioners, at least once in a year, and as much oftener as they deemed necessary, to visit all the charitable and correctional institutions of the state, excepting prisons, receiving state aid, and to ascertain certain facts particularly set forth in the statute which need not be stated in detail.

By chapter 571, Laws 1873, the duties and powers of that board were defined and enlarged, and its name changed to " the state board of charities." The board or any of its commissioners was thereby authorized, whenever they deemed it expedient, to visit and inspect any charitable, eleemosynary, correctional or reformatory institution in the state, excepting prisons, whether receiving state aid or maintained by municipalities or otherwise. This statute remained unrepealed and was in force when the Constitution was amended in 1894.

The Constitution, as amended in that year, declares that " The legislature shall provide for a state board of charities, which shall visit and inspect all institutions, whether state, county, municipal, incorporated or not incorporated, which are of a charitable, eleemosynary, correctional or reformatory character," including reformatories except those in which adult males convicted of felony shall be confined, and also excepting institutions which are subject to the visitation and inspection of the state commission in lunacy or the state commission of prisons. It then provides the manner in which the board shall be appointed, preserves the existing laws relating to such institutions, their visitation and inspection so far as they are not inconsistent with the provisions of the Constitution, and provides that the visitation and inspection therein provided for shall not be exclusive of other visitation and

inspection then authorized by law. It also declares: "Payments by counties, cities, towns and villages to charitable, eleemosynary, correctional and reformatory institutions, wholly or partly under private control, for care, support and maintenance, may be authorized, but shall not be required by the legislature. No such payments shall be made for any inmate of such institutions who is not received and retained therein pursuant to rules established by the state board of charities. Such rules shall be subject to the control of the legislature by general laws." It continues the existing state board of charities, and provides that the legislature may confer upon the board any additional powers that are not inconsistent with other provisions of the Constitution.

By chapter 771, Laws 1895, the laws relating to the state board of charities were revised and consolidated. That statute makes it the duty of the board to visit, inspect and maintain a general supervision of all institutions, societies or associations which are of a charitable, eleemosynary, correctional or reformatory character, whether state or municipal, incorporated or not incorporated, states in detail the nature and character of such inspection and supervision, and after mentioning some of the institutions subject to such supervision, adds this general provision : "And institutions, societies and associations, whether state, county, municipal, incorporated, or not incorporated, private or otherwise, which are of a charitable, eleemosynary, reformatory, or correctional character or design."

The legislature, by chapter 546, Laws 1896, passed a general act relating to state charities, the provisions of which, so far as they relate to this subject, are in substance like those of the Laws of 1895, and again after naming certain institutions, adds: "And all asylums, hospitals and institutions, whether state, county, municipal, incorporated or not incorporated, private or otherwise, except institutions for the custody, care and treatment of the insane, are subject to the visitation, inspection and supervision of the state board of charities, its members, officers and inspectors."

Thus, we find that under the Constitution and statutes of the state, the board of charities is required to visit, inspect and supervise the defendant institution, if it is charitable, eleemosynary, correctional or reformatory in its character or design. The main contention of the appellant is that such is not the character or design of its institution.

The proper determination of that question involves an examination of the statutes under which the defendant was organized, its articles of association and the proof contained in the record as to its character and design, and the nature of its work as indicated by the statute, its charter and the acts and offices it performs. It is to be borne in mind that the question to be here determined is the character and design of the defendant, and not merely the powers which are conferred upon it, or the means which may be adopted by it to carry that design into effect.

The defendant was organized under chapter 130 of the Laws of 1875. The title of that act was, " An act for the incorporation of societies for the prevention of cruelty to children." It provides the manner in which and by whom such societies may be organized, and confers upon them the power to prefer complaints for the violation of any law relating to or affecting children, and to aid in bringing the facts before a court or magistrate. It then requires all magistrates and peace officers to aid them in the enforcement of all laws relating to or affecting children.

In pursuance of that statute the promoters of the defendant made and executed a certificate, in which it was stated that they desired to associate themselves together for the purpose of preventing cruelty to children, and that the particular business and object of the society was to prevent cruelty to children, and the enforcement, by all lawful means, of the laws relating to or in anywise affecting children.

Thus it is seen that the primary object of the institution was to prevent cruelty to children. It was only for that purpose that the institution could have been properly organized under the statute. It is true that it conferred upon the defendant

the right to make complaints and furnish proof for the violation of any law affecting children, but obviously that right was given only as a means of effecting the primary purpose of the statute, which was to prevent cruelty to that class of the community. When we ascertain the manner in which this institution has been maintained and conducted, it corroborates our views and renders it quite obvious that its primary and only purpose was to prevent cruelty to children.

There is no dispute as to the manner in which this institution has been maintained and conducted. It is stated in the moving papers, no portion of which is denied except the conclusion of law as to the power of the board to visit and inspect the defendant. The defendant, however, sets forth in considerable detail the offices and acts it performs and the manner of their performance. It has been and is supplied with means to carry on and conduct its affairs by donations and contributions from benevolent persons, both by present gift and legacy, and by an annual appropriation of thirty thousand dollars, which is levied upon the taxpayers of the city of New York. During its existence, at an expense of more than three hundred thousand dollars, it purchased a site, constructed a building and furnished it. The building is seven stories in height. The third floor is used as a dining and play room, a reception room for the children and for matron's and attendants' rooms. The fourth and fifth floors are used for dormitories, for an infirmary and for nurses' rooms. Upon the sixth floor are a kitchen, laundry and nurses' quarters, and the top floor is an open playground for children. It has appliances for cleansing the children who are received at all hours of the day and night, and who are furnished with proper food, shelter, medical attendance and medicine during the period required for their permanent location elsewhere.

Among other acts and offices performed by the defendant, it supplies children with temporary relief and with clothing; affords temporary relief to destitute families and their children, provides them with medical attendance, pays the wages and

salaries of its numerous employees and assistants, amounting annually to many thousands of dollars, and performs other acts to prevent cruelty to the children of the city of New York.

As there is no dispute as to the facts which disclose the defendant's purpose and the methods it employs to effectuate the design of its organization, the question is presented whether, when its acts and methods are considered in connection with the statute and its certificate of organization, they show that its character and design is charitable, eleemosynary, correctional or reformatory. When thus considered it is manifest that the primary and fundamental purpose and design of this institution and of its promoters was to prevent cruelty to the children of the city of New York.

The statute authorized the defendant's incorporation but for one single purpose, which was to prevent cruelty to children. While it also conferred upon such an institution the power to make complaints and to aid in bringing the facts before a court or magistrate, yet, obviously, that power was not the sole right intended to be conferred. The certificate filed by the defendant expressly declares its purpose and the desire of its promoters to be to associate themselves together for the purpose of preventing cruelty to children, and that its particular object is the prevention of cruelty to children and to enforce by all lawful means the laws relating to or in any way affecting children, thus showing that the first and important purpose of its organization was to prevent cruelty to children, and that that purpose might so far as necessary be accomplished by enforcing the laws relating to them. It is manifest that the last clause of this provision was not intended to limit the general purpose to the means specified. It was one of the means that might be employed, but not the only one.

The work of the defendant is supported and maintained by gifts from benevolent and charitably disposed individuals, and the surrender of a portion of the funds raised by the city of New York to aid or sustain its various charitable institutions. (Laws 1882, ch. 410, as am. by chs. 25, 336, L. 1894; charter Greater New York, § 230.) Therefore, that the funds

employed by the defendant in its work were by their donors, both individual and municipal, intended as charities, there can be no doubt.

When we consider that the defendant, in executing the purpose of its organization, clothes the naked, shelters the houseless, feeds the hungry, defends the defenseless, heals the sick and finds homes for the homeless, it is difficult to believe that in character and design it is not charitable. Still, we are told that the sole purpose of its organization was that it might act as a governmental agency to aid in the enforcement of the criminal law, and that all its charitable acts and benefactions were mere incidents to that purpose. I fancy if, at the incorporation of the defendant, its worthy and generous president and the band of benevolent and charitable persons who were associated with him had been told that the sole purpose of its organization was to collect fines, enforce the criminal law and assist the district attorney, their surprise would have been simply confounding, and such a statement would have been denied with an energy characteristic of the president and his associates. To them such a claim would then have been as repugnant as it is unfounded.

· Moreover, if it be true that this institution is not that embodiment of a noble charity claimed by its president and other officers when appealing to a charitable public for assistance, then their appeal was based upon an assurance which was unfounded, and, consequently, untrue. Our respect for the individuals who have inaugurated and carried into successful operation this noble charity forbids us to believe them guilty of such an act. It was then believed by them to be, as we think it is, one of the most noble charities that exist in the state.

But it is said that the declarations of the defendant's officers as to its charitable character and design should have no weight in determining this question, as the views they then entertained were incorrect, and that, even though they were such as to induce the benevolent to aid in what was denominated "a noble charity," yet their declarations should be utterly dis-

regarded.   We cannot assent to that proposition.   Obviously, the promoters of this institution, who were all men of rare intelligence and some of them of eminent legal ability, correctly understood its character and design, and to now say they did not is to cast distrust either upon their intelligence or their integrity.

Any construction of the statute which would limit the purpose of the defendant solely to the execution of the criminal law as a governmental agency, is too narrow to meet with our approval.   If the enforcement of the criminal law was the sole purpose of the defendant's organization, it is difficult to discover the necessity for nurses, physicians, matrons and attendants, the erection and maintenance of large and expensive buildings and many other acts and things which are employed and done by the defendant in its benevolent work for the rescue of the miserable and suffering children of a great city.

Besides, if such had been the object of the statute, its title would have been " An act to authorize the organization of corporations to aid in the enforcement of the criminal law." With that title thus showing that such was the plain purpose of the law, the inquiry would at once arise by what authority and under what law was a corporation organized under such a statute justified in furnishing houses for shelter, physicians, medicine and nurses for the sick, food and clothing for the hungry and destitute and naked.   None can be found.   To justify the acts of the defendant and the manner in which it has executed the trust confided to it by a generous public and a liberal municipality, it must rely upon the statute as it is, and it must be construed as authorizing the noble charity which its officers described when they sought aid for its support, and which it has been declared to be by the chief executive of the city whose taxpayers so largely contribute to its maintenance.   Otherwise, they have, by a misappropriation of the funds placed in their hands, been guilty of a breach of the trust reposed in them by a confiding public.

The claim that the allusion which is made by the respondent

34

to the declarations of its officers as to the charitable character of the defendant is "to capture the rabble," naturally provokes the inquiry whether such was the purpose of its officers when they made those declarations. We think not, but that they were the sincere expressions of intelligent and honest minds to correctly represent the character of the institution, and the design of those who were instrumental in its inception.

To sustain the contention of the appellant it is urged that two classes of supervision could not have been contemplated by the members of the constitutional convention or by the legislature. The answer to this argument lies in the fact that the Constitution expressly provides that the visitation and inspection by the state board of charities provided for by the Constitution, shall not be exclusive of other visitation and inspection authorized by law.

It is also claimed that as the acts of charity which are performed by the defendant are temporary and dispensed to the many instead of the few, its design is not charitable. The logic of this contention is not apparent. Can it be properly said that an institution which dispenses its charity among the many, and for a short period of time, is less a charitable institution than one which aids a lesser number for a longer time? We think not. The charity of the former may be of more general application than that of the latter, but it is none the less a charity.

It is likewise argued that the fact that its agents are made peace officers is controlling evidence that the defendant is a mere governmental agent and has none of the attributes of a charitable institution. To this we cannot yield our assent. The necessity for their being made peace officers is obvious. The class of children which the defendant seeks to benefit is found in the slums and dens of a metropolitan community. They are oftentimes surrounded by criminals and desperate and dissolute men and women. To effect the rescue of these children it is oftentimes necessary that the defendant's agents shall have the power to arrest them or the persons by whom they are detained, and, hence, the powers of a peace officer

are required to accomplish its design. Otherwise it could not rescue the little victims of cruelty, and its efforts would be futile. That the power of peace officers is conferred upon its agents in no way indicates that the enforcement of the criminal law was the defendant's only purpose. What it does indicate is that by reason of the conditions by which they are many times surrounded, such authority is necessary to enable it to pursue the charitable work of rescuing unfortunate children from their environments of cruelty and brutality. Obviously the purpose of the statute was not to enable such agents to act as peace officers in the enforcement of the law of the state, but the power was conferred as an additional means by which the defendant could accomplish the general purpose of its organization. In other words, it was a provision of convenience or necessity and does not determine the character of the institution. The important purpose of this law, together with the laws authorizing the defendant's organization, is not to enable the defendant to aid the police department of New York in administering the law, while the prevention of cruelty to children is a mere incident; but the prevention of cruelty to children is the primary purpose, and the aid which it renders the police department in preventing such cruelty is incidental merely to such principal or primary object.

Again it is said : " The public-spirited citizens, who are the officers of the society and who have given many years of patient and unselfish toil to building up a most praiseworthy and indispensable institution, naturally resent unnecessary interference with their laudable work." That any such interference has been attempted or contemplated nowhere appears, and it may here be said that this feeling cannot have long existed as is manifest from the statement of its president, that " The people of the state of New York, by recent amendments to their Constitution, decided that the care and education of children are of paramount importance to the state. They enlarged the provisions for public education, and also lent strength and force to the numerous institutions conducted

by individuals in a corporate form for the care, support, main-
tenance and reformation of the helpless and vicious.   The
state board of charities, composed of eminent individuals
from different parts of the state, was invested with extraordi-
nary powers, not simply for the maintenance of these institu-
tions, but to insure the proper care and education of the children
intrusted to them.   Entirely unsectarian, conservative in its
views and firm in its action when abuses present themselves,
there is every reason to believe that this state board will give
an impetus to child-saving work which will be felt by the
people, the institutions and by the children alike, with most
satisfactory results to each."

The purpose of the Constitution and statutes, continuing and
defining the duties of the state board of charities, as was said
by this court in *People ex rel. N. Y. Inst. for Blind* v. *Fitch*
(154 N. Y. 14), was to require a close and more efficient super-
vision of these institutions, and they were adopted in response
to a public sentiment which existed throughout the state at
the time.   Their purpose was not only to secure the proper
expenditure of the public money of the state and different
municipalities, but also to protect the generous and charitable
by requiring their benefactions to be properly devoted to the .
particular purpose for which they were intended, and thus
that the contemplated recipients should receive the benefac-
tions that were designed for them, at least in the case of
institutions which are supported and maintained, wholly
or partly, by the state, or any of its political divisions or
municipalities.

But we have nothing whatever to do with the question
whether the constitutional amendment and the statutes relat-
ing to this subject are wise or unwise, desirable or undesirable,
beneficial or harmful, but the question before us is what is the
law, and when ascertained it is our plain duty to apply it as
we find it to the undisputed facts.   When this is done, but
one result can follow.   If the rules and requirements of the
state board of charities are supposed to be improper or harm-
ful to the defendant, the remedy lies with the legislature and

1900.] Peo. ex rel. Bd. Charities *v*. N. Y. Soc. P. C. C. **269**

N. Y. Rep.]        *Dissenting opinion, per* Martin, J.

not with the courts. Not only by every consideration of reason and propriety must the defendant be regarded as an institution which is partly if not wholly charitable in its nature and design, but it clearly falls within the term "charitable institutions," as it has been defined and applied in a great number of cases by our own courts and those of many other jurisdictions.

We, however, deem it unnecessary at this time to review the cases upon this subject, as we have so recently examined them that it would be a work of mere supererogation. When the cases referred to in the opinion in *People ex rel. N. Y. Inst. for Blind* v. *Fitch* (*supra*) and the cases cited in this case by the learned Appellate Division are examined, it will be found that they fully sustain the decision of that learned court. Although it has sometimes been difficult to define the word "charity" so accurately and acceptably that no doubt could arise as to its application, yet we think that the definition given by Judge Gray in *Jackson* v. *Phillips* (14 Allen, 539) is correct, that it should be followed in this case, and that it fully justifies the action of the court below. In that case the learned judge, after a careful and painstaking examination of many cases where the question of what constituted a charity was involved, and of the various definitions which had been given by learned judges and commentators, said: "A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with existing laws for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government."

Moreover, the question whether the defendant is a charitable institution does not seem to be an open one. We think the decision of this court in *People ex rel. N. Y. Inst. for Blind* v. *Fitch* (*supra*) is controlling in this case. It was there held that the word "charitable," as used in the Constitution and

statutes subjecting charitable institutions to the supervision of the state board of charities, is to be given its usual and ordinary meaning, and that it is not necessary that an institution should be wholly charitable to fall within their provisions, but it is enough if the institution is partly charitable in its character and purpose. Giving to the word "charitable" its usual and ordinary meaning, it is obvious that the defendant is a charitable institution within the meaning and intent of the Constitution and statutes, or at least that it is partly charitable in its character and design.

The claim that all the charitable acts and benefactions of the defendant are mere incidents to the purpose of executing the criminal law, cannot, and we think ought not to, be sustained, not only because such was not the intent and purpose of the statute and the organization of the defendant, but it was not the intention of the benevolent and philanthropic citizens who procured it. Their object was to inaugurate and maintain a benevolent and charitable institution for the benefit of an unfortunate and suffering class of the community in which they live. Its purpose was to rescue miserable and unfortunate children from the cruelty to which they were subjected, shield them in the future by securing for them places where they might be cared for until they could protect themselves, thereby relieving them from the brutality and noxious influences by which they were surrounded, and thus enabling them to become respectable members of society. If an institution with such a purpose and performing such offices is not charitable in its character and design, pray, what is charity? We cannot accept the contention of counsel that charity has become so scientific as to not mean charity at all.

The contention that the fact that the board of charities has not hitherto visited and inspected the defendant is evidence that it was not subject to such supervision, is, under the circumstances, entitled to little weight. It was not until about 1894 that this question was agitated by the public press, and petitions addressed to the constitutional convention from every part of the state were presented, calling attention

directly to the necessity for an improved, more rigid and more general supervision and visitation of such institutions. That at that time the question had become one of public interest is manifest not only from the public prints of that date, but also from the proceedings of the constitutional convention. To carry into effect a general and public desire for closer public supervision, the constitutional convention proposed the amendment to which we have referred, and it was adopted by the people. That amendment came with a force and meaning which called the attention of the board sharply to its requirements and the duties that it imposed. It was when the people and the legislature had thus spoken in no uncertain terms and declared the duties and powers of the board clearly and emphatically, that it sought to comply with the requirements of the Constitution and statutes and with their spirit and purpose. But if it were assumed that the present board of charities or its predecessors in office had been lax in the discharge of their duties, it in no way changed the Constitution or statutes which imposed them. Neglect of duty upon the part of public officers can hardly be held as evidence of the meaning of a statute or constitutional provision, nor relieve them or their successors from the discharge of a plain public duty. (*People ex rel. N. E. D. Meat Co.* v. *Roberts*, 155 N. Y. 408, 415 ; *People ex rel. Eckerson* v. *Zundel*, 157 N. Y. 518.)

Nor do I see any force in the contention that the provision of chapter 553, Laws of 1890, which exempts the defendant from taxation, is evidence that it was not an institution of a charitable, eleemosynary, correctional or reformatory character or design. That the act was procured by the defendant is plainly shown by the record. It was not, however, exempted from taxation upon the ground that it was a governmental agency of the state or city, but was classified with other charitable and benevolent associations. Thus, the action of the defendant in procuring this legislation not only indicated that it intended to procure its exemption from taxation, but the record shows that its avowed purpose was to secure and

that it secured such exemption upon the express ground that it was a charitable institution, and should be classified with other corporations of that character and exempted upon that ground.

Counsel for the defendant insists that the authorities cited by the court below, wherein it was held that societies to prevent cruelty to animals were of a charitable character, have no application here, and that those cases are clearly distinguishable from the case at bar. We not only find no sufficient ground upon which to base any such distinction, but the defendant seems to have entertained a contrary view, as it distinctly states in its opposing papers that while it is not associated with societies for the prevention of cruelty to animals it possesses similar powers as to children.

The importance of this question may, perhaps, be more fully appreciated when we remember that there are now at least twenty such societies organized in the state which expend annually for this charity in the neighborhood of a quarter of a million dollars, that they affect at least fifteen thousand children during the same period, and, as indicated by the past, that it is at least probable that such a society will soon be organized in nearly every county in the state.

Moreover, it is extremely difficult to discover any authority for the organization of a private corporation to act as a ministerial or administrative officer of the state or of any of its political divisions or municipalities for the execution of the criminal or other laws of the state. (*Fox v. M. & H. R. H. Soc'y*, 25 App. Div. 26.) If the defendant is held to be exempt from such visitation, then all other institutions, similar in character and purpose, must likewise be excepted from the operation of the Constitution and laws relating to the subject.

After a careful examination of all the questions presented in this case, we are unable to reach any other conclusion than that the defendant is subject to the inspection and visitation of the state board of charities, and that the court below correctly so held.

That those who inaugurated and carried into successful

operation, and have maintained this institution which has awakened the interest and aroused to action the charitable and humane everywhere throughout the land, object to the supervision of the state board of charities, is somewhat difficult of explanation. But assuming, as we do, that the reason in no way involves a lack of integrity or uprightness on the part of those connected with it, still, it in no way changes the duty of the court. It has ever been the theory of our government that the rich and the poor, the powerful and the weak, the high and the low, all stand alike in courts of justice. Therefore, although the reputation of the promoters of the defendant may be a moral assurance that no supervision of the institution is necessary, it is not a legal one. Indeed, one of the greatest difficulties which has been encountered in this case is the unimpeachable and unstained reputation of its promoters. That fact has been kept prominently before us. It is sometimes difficult to divert the mind from accompanying facts and individual friendships, even when a mere principle of law is involved, especially when a situation is disclosed where its application may seem unnecessary or unimportant. That such considerations may sometimes unconsciously warp the judgment and dull the perception of the most upright and independent, cannot be denied. And, yet, it is our imperious duty to close our eyes to questions of policy and personal friendship and simply decide the question before us without any regard to whom it may affect.

An erroneous decision of this case may not be especially important or harmful so far as the mere denial of the right to visit the institution of the defendant is concerned. The injury of such a decision arises from the fact that it practically repeals or substantially ignores the Constitution and statutes by which it was sought to protect the people, the charitable or eleemosynary institutions of the state and the objects of their bounty. This was to be accomplished by a reasonable supervision by a board which, in the language of the defendant's president, is "composed of eminent individuals from different parts of the state," and which is "entirely unsectarian,

conservative in its views and firm in its action when abuses present themselves." To again subject those institutions to the negligence or rapacity of careless or unscrupulous officers or employees is to be deplored and, if possible, avoided. Hence this court should hesitate before it disregards the plain and direct mandate of the people and of the legislature, their constitutional representative.

We are of the opinion that the defendant is an institution of a charitable or eleemosynary character, and that under the Constitution and statutes the state board of charities is required to visit and inspect it in the same manner as in case of other institutions of a similar character.

We think the order of the court below is right and should be affirmed.

O'BRIEN, J., reads for reversal; PARKER, Ch. J., concurs in memorandum; GRAY, J., concurs in memorandum, and BARTLETT, J., concurs; MARTIN, J., reads for affirmance, and HAIGHT and VANN, JJ., concur.

Orders reversed, etc.