In the Matter of WILTWYCK SCHOOL FOR BOYS, INC., Appellant, *v.* THEODORE HILL, JR., et al., Constituting the Zoning Board of Appeals of the Town of Yorktown, Respondents.

In the Matter of WILTWYCK SCHOOL FOR BOYS, INC., Appellant, *v.* LESTER A. PERRY, Building Inspector of the Town of Yorktown, Respondent.

Second Department, July 14, 1961.

*Harry G. Liese* and *Thomas A. Liese* for appellant.

*Harold Riegelman, H. H. Nordlinger, Simon J. Hauser* and *Donald J. Rapson* for respondents.

*Lowenstein, Pitcher, Hotchkiss, Amann & Parr* (*Henry G. Hotchkiss* of counsel), for Federation of Protestant Welfare Agencies, *amicus curiæ* in support of appellant's position.

*Shad Polier* for Citizens Committee for Children of N. Y., Inc., *amicus curiæ* in support of appellant's position.

*Louis J. Lefkowitz, Attorney-General* (*Paxton Blair* and *Ruth Kessler Toch* of counsel), for State of New York, *amicus curiæ* in support of appellant's position.

*Per Curiam.* In a proceeding by petitioner, Wiltwyck School for Boys, Inc., pursuant to statute (Town Law, § 267; Civ. Prac. Act, art. 78), to review and annul the determination of the respondents, the Zoning Board of Appeals of the Town of Yorktown, which affirmed the local building inspector's decision denying a building permit to petitioner whose land is in a resi-

dential zone in which schools are a permitted use, the petitioner appeals from an order of the Supreme Court, Westchester County, entered February 11, 1960, which affirmed the Zoning Board's determination, denied petitioner's application and dismissed the proceeding on the merits.

The grounds for the building inspector's denial of the permit were: (1) that petitioner's " proposed school does not conform to, or meet the requirements and standards of, school uses permitted in residential areas " and (2) that the " proposed use does not qualify or meet the standards and requirements of permitted charitable or eleemosynary institutions, as defined in the Zoning Ordinance ".

Petitioner appealed from the building inspector's decision to the Zoning Board on the sole ground that petitioner's proposed use was a school use within the meaning of the Zoning Ordinance. After a hearing the board affirmed the inspector's decision that petitioner's proposed use was not a school use under the ordinance.

Petitioner thereupon brought this article 78 proceeding against the board to review and to annul their determination on the ground that its proposed use is a school use and on the further ground that the ordinance, to the extent that it does " bar an institution of the type maintained by petitioner," is invalid and unconstitutional. This appeal is from the order dismissing that proceeding.

Petitioner also instituted another article 78 proceeding directly against the building inspector to compel him to issue the building permit, on the ground that the Zoning Ordinance as applied to petitioner is unconstitutional. The order dismissing that proceeding is the subject of the companion appeal (*Matter of Wiltwyck School for Boys* v. *Perry*).

Order affirmed, without costs.

We are of the opinion that the proof before the respondents was sufficient to sustain their finding that petitioner's primary purpose was the treatment and rehabilitation of delinquent or maladjusted boys, and that it therefore did not qualify as a school within the meaning and intent of the Zoning Ordinance. Respondents' determination as to the nature of petitioner's activities was not arbitrary or capricious, and their construction of the Zoning Ordinance was proper under its plain language. Under the circumstances, their determination may not be disturbed by this court (cf. *People ex rel. Hudson-Harlem Val. Tit. & Mtge. Co.* v. *Walker,* 282 N. Y. 400, 405; *Matter of Schoen* v. *Bowne,* 273 App. Div. 1020, affd. 298 N. Y. 611; *City of Buffalo* v. *Roadway Tr. Co.,* 303 N. Y. 453, 462).

The fact that petitioner is subject to supervision by the State and the fact that the proposed site had been approved by a State agency, do not render respondents' determination either invalid or in violation of petitioner's constitutional rights (cf. *Matter of Jewish Mental Health Soc.* v. *Village of Hastings,* 268 N. Y. 458).

\* \* \*

In a proceeding by petitioner, Wiltwyck School for Boys, Inc., against the building inspector of the Town of Yorktown, pursuant to article 78 of the Civil Practice Act, to compel him to issue a building permit to petitioner in "disregard" of the Town Building Zone Ordinance, on the ground that, as applied to petitioner's property located in a residential zone in which schools are a permitted use, the ordinance is unconstitutional, the petitioner appeals from an order of the Supreme Court, Westchester County, entered April 28, 1960, after trial (24 Misc 2d 281), which affirmed the building inspector's decision denying the permit, which declared that petitioner's proposed use of the buildings sought to be erected is not a permitted use under the Town Zoning Ordinance; and which declared valid and constitutional the Zoning Ordinance as interpreted by the building inspector and as applied to petitioner's proposed use of its property.

Order affirmed, without costs.

In our opinion, petitioner failed to sustain the burden of proving the invalidity of the ordinance and the amendments thereto (cf. *Rodgers* v. *Village of Tarrytown,* 302 N. Y. 115, 121). On the contrary, the proof established that the ordinance as amended was a legitimate exercise of the police power of the town and that it promoted the general welfare of the community. Under such circumstances the determination of the local legislative body may not be disturbed by the courts (cf. *Village of Euclid* v. *Ambler Realty Co.,* 272 U. S. 365, 388; *Rodgers* v. *Village of Tarrytown, supra; Levitt* v. *Incorporated Vil. of Sands Point,* 6 N Y 2d 269). We are also of the opinion that the ordinance does not violate petitioner's constitutional rights or conflict with State law or policy (cf. *Matter of Jewish Mental Health Soc.* v. *Village of Hastings,* 268 N. Y. 458; *Matter of Wiltwyck School for Boys* v. *Hill,* decided herewith).

NOLAN, P. J., BELDOCK, CHRIST and BRENNAN, JJ., concur.

KLEINFELD, J. (dissenting). The building inspector of the Town of Yorktown has refused to issue a building permit to petitioner, Wiltwyck School for Boys, Inc. (hereafter called

"Wiltwyck" or "W"), for the erection of six dormitory buildings upon its 113-acre tract of land in the town. These buildings are the first phase of a building program to provide complete new facilities for W.

The building inspector's action has been sustained by the local Zoning Board of Appeals, by the Special Term (*Matter of Wiltwyck School For Boys* v. *Perry,* 24 Misc 2d 281), and by the majority of this court on the ground that Wiltwyck's proposed use of the buildings will be primarily for "the treatment and rehabilitation of delinquent or maladjusted boys, and that it therefore did not qualify as a school within the meaning and intent of the Zoning Ordinance" of the town.

Two basic questions are presented on these appeals: (1) whether W's proposed use will be primarily a school use as permitted by the Zoning Ordinance; and (2) if it be concluded that W's proposed use is not a school use but is primarily for the rehabilitation of delinquent, dependent or neglected boys, whether the latter use may be validly prohibited by the ordinance.

It is my opinion, based upon the established facts in the record, that both these questions must be resolved in W's favor as a matter of law.

It is undisputed that W's land is in a residence zone. It is also undisputed that in such a zone the ordinance permits: (a) "public, elementary and high schools;" (b) "private and parochial elementary and high schools in accordance with the provisions of Section 440.18;" (c) all "customary accessory" school uses; and (d) charitable institutions "in existence in the Town" prior to January 6, 1959 (Yorktown Zoning Ordinance, §§ 423, 440.18, 220). More specifically, the ordinance provides that:

(1) A private or parochial elementary or high school or a college or seminary "shall be permitted," provided "that it is a school offering a comprehensive curriculum of study similar to that of a public school;" and "customary accessory uses to schools or colleges" are expressly authorized (§ 440.181).

(2) An accessory use is one "which is customarily incidental and subordinate to the principal use" of the land or building (§ 220).

(3) A private educational institution is: "Any non-public school or other organization or institution conducting a regularly scheduled comprehensive curriculum of study similar to that of the public schools and operated by non-stock corporations under the Education Law of this State" (§ 220).

(4) Dormitories and single-family dwellings limited to the use of students, teachers and staff members, are expressly authorized and permitted as " accessory buildings " to parochial and private schools (§ 440.185).

(5) Every use not specifically permitted in any zone is expressly prohibited (§ 423).

It is also undisputed that on January 6, 1959, after the town officials had learned of W's proposed purchase of the land and of its intention to use the land for its purposes, but before it had actually applied for the building permit, the town amended its Zoning Ordinance (§§ 423, 220). By these two sections as amended, the town prohibited every charitable institution from using land for its purposes unless the land had been so used *prior* to the date of the amendment, namely, January 6, 1959. In other words, whereas previously a charitable use was a conforming or permitted use in a residence zone, under the amendment it became a nonconforming or prohibited use unless it be a continuation of a prior conforming use.

With reference to the character of W's organization and activities, the record discloses the following facts, which are either undisputed or uncontradicted:

W was incorporated in 1942 under the Membership Corporations Law; its charter was amended in 1955. Its purpose, as stated in the amended charter, is: " To administer, for dependent, neglected, abandoned, destitute, delinquent and emotionally disturbed children * * * *a constructive program of moral and spiritual enlightenment, character development, correction of behavior problems, education and training for good citizenship; and, as part of the foregoing program* to conduct a home for such children; to establish and operate an additional home for those children who may be emotionally disturbed; and to operate a boarding home program for such children as may need it " (emphasis added).

Both the original charter and the amended charter were approved by the State Education Department and the State Board of Social Welfare.

The Education Department's approval was obtained: (a) because the Membership Corporations Law (§ 11, subd. 2) and the Education Law (§ 216) both mandate such approval where the certificate of incorporation shall specify a purpose " for which a corporation may be chartered by the regents " of the State University under the Education Law; and (b) because section 216 of the Education Law authorizes the Regents to incorporate or charter any institution or association " for the promotion of * * * education in any way."

The Social Welfare Board's approval was obtained: (a) because the Membership Corporations Law (§ 11, subd. 1) and the Social Welfare Law (§ 35) require such approval where the corporation's stated purpose is the "care of destitute, delinquent, abandoned, neglected or dependent children;" and (b) because under the Constitution the State Board of Social Welfare is empowered to supervise and inspect any corporation or agency "exercising custody of dependent, neglected or delinquent children" (N. Y. Const., art. XVII, § 2). The Legislature has in effect declared, however, that the exercise of such power by the Board of Social Welfare shall leave unaffected and unimpaired the power and authority given to corporations by their charters (Social Welfare Law, § 388).

Pursuant to its charter, W presently maintains in Esopus, Ulster County, 100 delinquent, neglected, dependent, maladjusted or emotionally disturbed boys. Its cost of operation is financed partly by the Welfare Department of the City of New York, partly by the State Board of Social Welfare, and partly by private contributions. It has a regular paid staff of 110, which includes: 15 social workers, 3 psychologists, 4 part-time psychiatrists, 3 nurses, 2 teachers for remedial reading who also assist in arithmetic, and 34 counselors who live with the boys every day. In addition to this staff, there is a part-time piano teacher, a pediatrician and a specialist who are available "on call" and a faculty of 11 licensed teachers who are employed and paid by the City of New York (and to whom further reference will be made below).

W's policy is to take only the neglected, delinquent and maladjusted or emotionally disturbed boys between 8 and 12 years of age whom it can help or rehabilitate by its course of instruction, training and care, or, as frequently epitomized, by its "treatment" or their "treatability." Before a boy is accepted he is thoroughly evaluated in the light of the problems which he presents. He is examined and his record reviewed by W's admissions committee in order to determine whether he can be rehabilitated at W, that is, whether he is for W and whether W is for him.

Whether or not W in the past had accepted boys who were "psychotic" is disputed. That is the principal factual issue involved; hence, it will be discussed separately below.

W presently gets all its boys by referral either from the Children's Court or from the Welfare Department of the City of New York, but W is not confined to the acceptance of boys from New York City. If the boy who has been referred by a

Judge of the Children's Court be accepted by W, then of course the boy must be formally committed to its custody by court order (Domestic Relations Court Act of City of New York, § 83). One half or 50 of the boys come through the Children's Court, and are classified as delinquent; the other half come through the Welfare Department and are classified as: 29 dependent and 21 neglected. (Resp. Ex. H.)

All the boys are of the Christian faith; two thirds of them being Protestant and one third Catholic. A Protestant chaplain is in residence at W. But all the children receive instruction in accordance with their particular religious beliefs. The Catholic boys go to Mass and Confession and, during released time, they receive instruction in Catholic doctrine. The Protestant boys attend Sunday school; they participate in Bible reading and in singing and, during released time, receive instruction in their religious doctrine. They also have a church choir which has performed in all the surrounding communities as well as in New York City and on a television program; and their renditions have been so good that they have been repeatedly asked to return for another performance.

At W, the City of New York provides the same instruction, on an elementary school level, that it provides in its elementary public schools; the same curriculum is followed; its faculty of 11 teachers, referred to above, conduct daily for six hours, from 9 to 3 o'clock, nine classes in which all the 100 boys are enrolled and in which the teachers give instruction in the common branches of education: writing, reading, arithmetic, spelling, language, social study, arts and music. The classes are ungraded; promotion is made on the basis of achievement. The work of the city teachers, however, is integrated with the work of W's staff. Because of the help in remedial reading and in arithmetic given by W's staff and because of the small classes of 14 to 16, many of the boys progress quickly, advancing two to three grades in one year. Some of the boys do so well that they go on to junior high school.

While the city teachers are employed and paid directly by the City, the classes held by them are otherwise supported and maintained by W on its premises and are run under its auspices as an integral part of its work. The classes are designated by the City Board of Education as "P. S. 615, Manhattan" and are one of its popularly known "600 Schools" *for delinquent children.*

After three o'clock, the W counselors and staff take over. The boys then engage in every variety of athletic, social, cultural

and musical activity in which boys of their age would normally engage at boarding school. Thus, they have formed baseball, basketball and softball teams; they engage in competition with neighborhood teams as part of the Baseball Little League, the Basketball Little League and the Softball Little League in the Esopus area; they have a Christmas dance attended by the boys who do not go to New York City for Christmas vacation; they receive piano instruction, and some of the boys have learned to play quite well; they have organized a steel drum band, and have given performances at various camps, at the Tanglewood Music Center and at Carnegie Hall; they go to art exhibits at the Metropolitan Museum in New York, and to Shakespeare plays and to concerts in Poughkeepsie; and they hear ensemble groups who come to W and play classical music for them.

The wide and the true scope of W's teaching and training program, beyond the teaching from 9 to 3 by the city school teachers, is also reflected by the "Treatment Services" and the "Envir. Treatment" listed on the town's own exhibits. These exhibits show that the so-called treatment service or environmental treatment consists of the following: a variety of athletic and sport activities; cooking, music, reading, dramatics, crafts, construction toys, hiking and nature study, gardening and animal care, and social and folk dancing. These exhibits also disclose that, in greater or lesser degree, *every* boy at W is subjected to and participates in all these activities, and that they are *all* subjected to the same "environmental treatment."

While four part-time psychiatrists are on W's staff, the boys are not subjected to any particular psychiatric "treatment." They are subjected simply to a general program of activities which will "counteract those forces which have created" their maladjustments and which have led them "into conflict of one sort or another with the society in which they live." Their symptoms of maladjustment "generally diminish greatly with removal" to the W environment; a large percentage of them simply by the physical transition show a marked improvement; they adjust very quickly to their new setting and lose the pattern of their prior abnormal behavior.

This general program at W necessarily would exclude, and the record negatives, the treatment which commonly denotes and accompanies psychiatric medical treatment, to wit: the couch therapy, the shock therapy and the tranquilizer-drug therapy, which can be administered only in a hospital setting of quiet and seclusion. Indeed, no claim is even advanced that any such therapy is used at W. Obviously, in the W setting it would

be impossible to apply it. The fact should be noted, however, that without any such medical treatment, W has done exceedingly well. As one of the town's witnesses stated: W is an institution "characterized by nobility of purpose, by competence of operation and by excellence of accomplishment."

The foregoing contains a resumé of the undisputed or uncontradicted facts in the record. There is, however, as stated, a serious dispute as to W's past policy with respect to its acceptance of boys who are so emotionally disturbed as to be psychotic; that is, mentally ill or insane.

It is true the record does indicate that in the past a small number of boys (19 in 1954, and 12 in 1959) who *initially* exhibited psychotic *symptoms* were admitted to W. There is no proof, however, that they were *later* found to be psychotic. All the proof is to the contrary. Thus, the Deputy Commissioner (Robert Shulman) of the State Department of Social Welfare testified without contradiction that his department's monthly examination of W's records showed no psychotics at W; that every month his department issued to W certificates showing its compliance with the department's rules; that payment to W for each boy's maintenance was made on the basis of such compliance certificates; and that no such certificates would have been issued if psychotics were accepted or treated at W, since W was not empowered to maintain or treat psychotics and since his department was not empowered to reimburse W for such maintenance or treatment. The Commissioner of Welfare (James R. Dumpson) of the City of New York testified without contradiction substantially to the same effect.

It is also true the record indicates that, incident to past public releases and written solicitations for contributions, certain individuals then affiliated with W "puffed up" its wares. They stated, in effect, that it would accept and rehabilitate every boy between 8 and 12, no matter how bad his emotional disturbance may be.

But the record also discloses without dispute or contradiction: (1) that the boys with the psychotic symptoms were not given any psychotic medical treatment; they were given the same care, training and education as, and were treated no differently than, all the other delinquent and emotionally disturbed boys; (2) that whatever its policy may have been in the past, W has now emphatically repudiated any policy of accepting boys who are psychotic; (3) that its present policy is not to accept such boys; and (4) that such a policy shall prevail in the future at W.

The conclusiveness and the *bona fides* of W's present and future policy with respect to denying admission to psychotic boys can hardly be disputed or challenged. For its adherence to such a policy is not a matter of choice; its adherence is compelled by the law of the State and by the law of self-preservation, because: (1) W's charter does not permit it to accept or treat psychotic boys; (2) such mentally ill boys must be confined, upon certification by two qualified psychiatrists and by order of the court, in a hospital under the supervision of the Department of Mental Hygiene (Mental Hygiene Law, §§ 74, 75); (3) if W transgresses it may be quickly halted and adequately disciplined; (4) if it should knowingly accept or treat psychotic boys it would at once disqualify itself from getting its essential financial support of $13.39 per diem per capita, now paid jointly by the city and State in partial reimbursement to W for its maintenance of *delinquent, dependent and neglected* boys; to that effect the Deputy Commissioner of the State Department of Social Welfare and the Commissioner of Welfare of the City of New York both testified without contradiction; and (5) W's facilities and personnel are wholly inadequate to treat psychotic boys. The City Welfare Commissioner, without contradiction, testified that psychotics can be treated only by psychiatrists who are " in residence on an around-the-clock basis, which [W] does not have "; its four psychiatrists serve on a part-time basis.

The fact that in the past W may have " accepted " some boys with psychotic symptoms, and the fact that in some writings its work was " puffed up " to include the care of such boys, were in great measure responsible for the holding by the local Zoning Board, by the Special Term and by the majority of this court that W was not in reality a school as its name implies, but primarily a " treatment " center.

Under the circumstances here, however, the court may not consider these facts, because: (1) there is no affirmative proof that W actually maintained or " treated " boys who were in fact found to be psychotic; there is overwhelming uncontradicted negative proof; (2) under W's charter, under the Mental Hygiene Law and under the Zoning Ordinance, W is not legally permitted to accept or treat psychotic patients; as indicated, its transgression may be quickly enjoined; (3) W's charter powers are the only criterion which may be legally utilized to determine its true character and permissible scope of operation (*People ex rel. State Bd. of Charities* v. *New York Soc. for Prevention of Cruelty to Children*, 161 N. Y. 233, 239, 240, 242, 250–251;

*City of Rochester* v. *Rochester Girls' Home,* 194 N. Y. S. 236, 238); and (4) in any event, these proceedings being in equity, the determination of W's rights under the Zoning Ordinance must be made on the basis of the situation existing at the time of trial, and not on the basis of any prior condition which has since been remedied (cf. *Incorporated Vil. of Brookville* v. *Paulgene Realty Corp.,* 24 Misc 2d 790, 791, and cases there cited, affd. 14 A D 2d 575 [2d Dept.]).

In the *New York Society* case (161 N. Y. 233, *supra*), precisely the same issue was involved. The Society by its charter was empowered only to prevent cruelty to children and to enforce the laws affecting children. However, it had engaged in extensive activities not authorized by its charter, to wit: the temporary feeding, clothing and care of children; and its promoters and officers had proudly proclaimed to the world its performance of such and similar charitable functions. Thereupon, on the theory that it was a charitable corporation exercising charitable functions and that its officers themselves so claimed, the State Board of Charities attempted to subject it to the board's control and to compel its compliance with the board's rules. The court held, however, that the character of a corporation must be determined only by the powers which it may lawfully exercise under its charter, and that any *other* powers which it may exercise or advertise must be disregarded as immaterial. As the several Judges of the Court of Appeals so aptly stated:

"A corporation cannot be classified by what its friends or promoters may say about it, but only from the nature of the powers which it may *lawfully* exercise and the business in which it is *lawfully* engaged. It is manifest, therefore, that in any inquiry concerning the nature, character or classification of any particular corporation, the only safe guide is the charter or law of its creation prescribing the powers that it may exercise and defining the nature of the business or the duties for which it was created. [pp. 239–240, O'Brien, J.] * * *

"We quite agree with the society that the furnishing temporarily of shelter, food, clothing and medical attendance are incidental to its main purpose. *The test* of its character is undoubtedly the objects which it seeks to attain as specified in the law of its being and — following that law — in its certificate of incorporation. [p. 242, O'Brien, J.] * * *

"Such charitable work as it does, in the general sense, is merely incidental and transitory in the temporary care of such children as, for the time being, while the society is enforcing

the law in particular cases, are detained in its custody.   *   *   *
But that incidental work does not characterize the corporate
existence and functions as charitable in the legal sense.   We
must refer for that characterization to the charter, *which is
the map of its corporate life and which prescribes what functions
it may lawfully exercise."* [pp. 250–251, GRAY, J.] [Emphasis
added.]

Since, under the circumstances here, W's *past* acceptance at
Esopus of boys with psychotic symptoms may not properly be
considered in determining its *future* use of its land in Yorktown,
it follows that its present right to the building permit under
the Zoning Ordinance must be decided on the basis of all the
other undisputed and uncontradicted facts recited above.   As
hereafter shown, such facts warrant the conclusion, as a matter
of law, that W intends to utilize its land for educational purposes
and a school.

The only essential difference between W and the conventional
public elementary school is that W is a boarding school; that it
houses and teaches impoverished delinquent or problem boys
between 8 and 12 exclusively; and that it devotes more time,
effort and personnel than the public school to the boys' charac-
ter rebuilding and rehabilitation while still adhering to the
" comprehensive curriculum of study similar to that of a public
school " (cf. Zoning Ordinance, § 440.181).

It is this difference which has been held to rob W of its
character as a school.   It is this difference which, in my humble
opinion, gives to W the very attributes and the essence of a
school in the truest sense of the word and in the highest tradition
of education.

It is almost a truism to say that in this great State every
child has a constitutional right to a free education at the State's
expense.   The Constitution commands it and expressly authorizes
the Legislature to provide the necessary funds; and the statutes
not only authorize it but render it compulsory (N. Y. Const.,
art. XI, § 1; Education Law, § 2554, subds. 9, 18, 20, §§ 3204,
3205, 3210; cf. *Rogers* v. *Association for Help of Retarded
Children,* 308 N. Y. 126, 130; cf. *Brown* v. *Board of Educ.,* 347
U. S. 483, 493).

The education of its children is a solemn duty which the State
has assumed by virtue of its historic power as *parens patriæ*
(*Matter of Hirshfield* v. *Cook,* 227 N. Y. 297, 301; *People ex rel.
Board of Educ.* v. *Graves,* 243 N. Y. 204, 208–209; *People* v.
*Ewer,* 141 N. Y. 129, 133, 135; *Matter of Jewish Child Care*

*Assn. of N. Y.* [*Sanders*], 6 A D 2d 698, affd. 5 N Y 2d 222; *Packer Collegiate Inst.* v. *University of State of N. Y.,* 273 App. Div. 203, 208, revd. on other grounds 298 N. Y. 184; *Matter of Brock,* 245 App. Div. 5, 11–12). It is a duty the performance of which has become the deep-rooted policy of the State because: "Today, education is perhaps the most important function of state and local governments * * *. It is required in the performance of our most basic responsibilities * * *. It is the very foundation of good citizenship" (*Brown* v. *Board of Educ., supra,* p. 493); hence, it is a policy which "is not to be lightly interfered with" (*People* v. *Braunstein,* 248 N. Y. 308, 310).

What unfortunately is not so well known are the closely allied facts: (1) that the Legislature has taken extreme precautions to prevent this right to a free education from being denied to any child in the State because nature or environment has rendered him delinquent, neglected, emotionally unstable or mentally or physically retarded or handicapped — no matter what the extent of the disability or handicap or emotional disorder may be, provided only that he can benefit by the instruction; (2) that from time to time the Legislature has enacted special laws to guarantee an education to such a child; and (3) that the People by the Constitution have expressly removed any limitation upon the State's expenditure of money for the education, health and welfare of all such children (N. Y. Const., art VII, § 8; Education Law, § 3214, subds. 1, 3, 4, § 4401, § 4507 [added L. 1957, ch. 363], § 4409 [added L. 1959, ch. 680]; cf. *Matter of Brent* v. *Hoch,* 25 Misc 2d 1062, 1066, affd. 13 A D 2d 505).

A brief outline of several of these statutes is most enlightening:

(1) The Education Law authorizes the establishment of special "parental schools" for delinquent children who are habitually truant from school or who are disorderly or insubordinate during attendance; it authorizes their confinement, maintenance and instruction at such parental schools; and it authorizes the school authorities to contract with private schools for their confinement, maintenance and instruction (§ 3214, subds. 1, 3, 4).

(2) The Education Law makes special provision for the education of physically or mentally handicapped or retarded children *and of delinquent children,* defining a "delinquent" as a minor "who is under commitment or remand by a court of competent jurisdiction or who has been legally surrendered by his parent or guardian to an institution established under

and incorporated by state law to provide care, custody and rehabilitation for delinquent children "; defining a " child with retarded mental development " as a minor who "because of retarded intellectual development as determined by an examination by an approved psychologist or psychiatrist, is incapable of benefiting through ordinary classroom instruction, but who may be expected to profit from special educational facilities "; and providing for all of them special classes, suitable educational facilities and transportation (§§ 4401–4405).

(3) The Education Law directs the school authorities in each school district to establish *for severely retarded children* " such special classes as may be necessary to provide instruction and training adapted to the mental attainments of such children " (§ 4406).

(4) The Education Law authorizes the Education Department to contract with any institution *outside* the State in the event there be inadequate facilities within the State for the education of a child who is suffering any "unusual type of handicap or combination of handicaps "; and authorizes the department to expend for such purpose a sum not exceeding $2,000 per annum for each such child (§ 4507).

(5) The Education Law authorizes every school board to furnish, for pupils who have been exempted from school attendance " because of an emotional disorder," such service " as may be necessary to provide instruction adapted to the mental attainments of such children " (§ 4409 [added L. 1959, ch. 680]).

(6) The Education Law authorizes and directs the Education Department: (a) " To maintain a register of physically handicapped and mentally retarded children and to use all means and measures necessary to adequately meet the physical and educational needs of such children, as provided by law "; and (b) " To stimulate all private and public efforts designed to relieve, care for, cure or educate physically· handicapped and mentally retarded children, and to coordinate such efforts with the work and function of governmental agencies " (§ 4402 [as amd. by L. 1956, ch. 722, L. 1957, ch. 718]).

The Education Law also directs every school district to provide periodic medical examinations of all children attending public schools by qualified licensed doctors and nurses; it directs a special medical examination of those children who are suffering from defective sight or hearing or from any other physical disability or handicap (§§ 901, 904); and it authorizes the voters or board of education of any school district to provide resident

children who attend schools *other than* public "with all or any of the health and welfare services and facilities" available to children in the public schools (§ 912). (In connection with medical examinations, it is of interest to note that the State Education Department recently ruled that parents have a right to see the reports of *psychiatric and other mental examinations* of their children [The *New York Times,* May 18, 1961, p. 12, col. 1]).

Finally, it is important to note this significant mandate of the Legislature: that in every public *and private school, every child* above the age of eight years shall receive as part of the prescribed courses of instruction " such physical education under the direction of the commissioner of education as the regents may determine "; that all " Such courses shall be designed to aid in the well-rounded education of pupils and in the development of character, citizenship, physical fitness, health and the worthy use of leisure "; and that all pupils above such age " shall be required to attend upon such prescribed courses of instruction " (Education Law, § 803, subds. 1, 4).

From these numerous statutory provisions it is quite evident that in almost every direction the State is making a most determined effort to insure the *complete* education, and to promote the mental, physical and spiritual well-being, of every child (normal or abnormal), with special recognition being given to the abnormal child, that is: to the child who is delinquent or who is mentally or physically disabled, retarded or handicapped. The Legislature has consistently followed the principle that the greater the child's abnormality or problem (physical, mental or emotional), the greater and the more impelling is the need for his *complete* education (cf. *Matter of Brent* v. *Hoch,* 25 Misc 2d 1062, 1066, affd. 13 A D 2d 505, *supra*).

Only a few weeks ago this broad educational policy of the State was indirectly affirmed by the Court of Appeals; it sanctioned the daily recitation in public schools of the nonsectarian " Regents' Prayer " to God (*Matter of Engel* v. *Vitale,* 10 N Y 2d 174, decided July 7, 1961).

The education at W, serving as it does the " problem " boy who is delinquent or dependent or who is suffering from some mental or emotional handicap, is in complete harmony with this enlightened education policy of the State. For at W the boy, under ideal living conditions, with the precept and example of his " big brother " counselor constantly before him, is subjected to a regimen of concentrated instruction which seeks to reorient,

develop and strengthen the trinity of mind, body and soul. In the process, the uncontradicted proof shows, his reading and learning difficulties diminish or fade; many of the "problem" boys advance rapidly in their classes; and in due time their emotional disturbances subside. Education which is capable of producing such a salutary result, not only for the boy, but for the State as well, is precisely the kind of education which the People by the Constitution and the Legislature by the Education Law sponsor for every child — and especially for the unfortunate child who is delinquent or emotionally or physically handicapped.

The education at W is also in perfect accord with the modern concept of education expounded by learned authorities in that field. Thus, they say: (a) that the true function of education is to develop to their full potential the ancient triumvirate — mind, body and spirit of every child, and particularly of the abnormal or exceptional child; (b) that "in our American way of life every individual is sacred, and those who can benefit have a right to an education adapted to their particular needs and abilities"; (c) that "before an educational program can be organized and effectively adapted to the particular needs and potentialities of each individual, the total child must be thoroughly known and understood," especially if the child be one who suffers "outstanding physical or mental defects or deficiencies"; and (d) that:* "It is a truism, therefore, that to be successful, any educational program for handicapped children [must] be predicated upon an accurate and complete knowledge of each child; this is obtained, as far as possible, from technical studies and scientific examinations. The acquisition of this necessary information, which is very extensive in scope, requires the services and contributions of individuals who are trained and experienced in various disciplines. As a result the 'teacher' in any modern educational program, and therefore in all special programs, is no longer the individual, but a 'team' which consists of all those who can or should contribute to the understanding and education of the child. This team of educators consists primarily of the child's parents, religious counselors and classroom teacher; in addition, it may include a pediatrician, psychiatrist, cardiologist, or other medical specialist; nurse, psychologist, school social worker; family, child, or health case worker; educational and vocational guidance counselor; recreational worker, etc. The number of individuals who will constitute the team will vary according to the specific needs of the child and the extent to which all the necessary helps are available and can be organized into this

particular cooperative effort.  *  *  *  The optimum educational benefits are achieved only when all members of the team work together harmoniously and effectively for the realization of its common goal — the total needs, best interests, and highest good of each child." *

The education at W also fulfills perfectly its charter powers, namely: to provide for delinquent and emotionally disturbed children " a constructive program of moral and spiritual enlightenment, character development, correction of behavior problems, education and training for good citizenship ''. These charter powers are so completely and essentially educational that they may well be a paraphrase of the provisions of the Education Law or of the text of the treatises on the function of education, cited above.

The fact is that the ideals stated in the charter can be and are being attained only by means of the educational process. That process is now being applied daily at W because it " has the three prime requisites which  *  *  *  are essential to make up a school: a curriculum, a plant consisting of adequate physical facilities, and a qualified staff to carry into effect its educational objectives " (cf. *Incorporated Vil. of Brookville* v. *Paulgene Realty Corp.,* 24 Misc 2d 790, 792, *supra,* affd. 14 A D 2d 575 [2d Dept.]).

In the light of the provisions of the State Constitution and of the Education Law, and in view of the modern concept of education, there is no legal justification for the inference or conclusion drawn by the Zoning Board, by the Special Term (*Matter of Wiltwyck School For Boys* v. *Perry,* 24 Misc 2d 281), and by the majority of this court, that, since W's primary purpose is to rehabilitate delinquent or maladjusted boys by progressive means, their education must be deemed to be merely incidental to that purpose and, hence, it cannot qualify as a

---

* Frampton and Gall, Special Education for the Exceptional, vol. 1, pp. 206–207, 21, 27, 28, 80, 81–83, 89, 123, 126–127; Fifty-fourth Yearbook of National Society for Study of Education (1955), Role of Mental Health in Education, Harry N. Rivlin, part II, p. 10; Forty-ninth Yearbook of National Society for Study of Education (1950), Education of Exceptional Children, part II, pp. 3, 11, 15, 281, 293–297; Woodruff, Psychology of Teaching (1951, 3d ed.), pp. 36–37; Encyclopedia of Educational Research (1960, 3d ed.), pp. 184, 186, 188–189; Smiley & Diekhoff, Prologue to Teaching (1959), p. 233; Harry N. Rivlin, Teaching Adolescents in Secondary Schools (2d ed.), pp. 34, 60; see, also, Annual Reports of the Superintendent of Schools (1961), pp. 5, 6, 7, 11, 21, and (1953), pp. 1, 2, 12; Development of Moral and Spiritual Ideals in Public Schools, Board of Education of City of New York (1956), pp. 3–7, 15; Fostering Mental Health in Our Schools, 1950 Yearbook, Association for Supervision and Curriculum Development, National Education Association, pp. 2, 181.

school under the Zoning Ordinance. As indicated, such a conclusion, logically and legally, is a *non sequitur*.

While W's primary purpose or ultimate goal is undoubtedly to rehabilitate the delinquent and the maladjusted child, the decisive point is that it does so by means of one essential process: education. The summary of all its undisputed activities — six hours of instruction in the three R's and the rest of the day devoted to athletics, music, dramatics, nature study, religious training and cultural pursuits — shows that this is the only process utilized.

The label used to describe W's educational process or activities is not controlling; the test is whether the teaching and learning process is being pursued during the child's waking hours. Hence, the repeated use of the word " treat " or " treatment " is neither decisive nor significant. The meaning of that word depends wholly upon its setting. Its use here obviously represents nothing more than the colloquialism of the social worker or the jargon of the psychologist and the psychiatrist in order to epitomize the total didactic process applied to the education of the delinquent or exceptional child in need of special attention. It is not to be equated with the medical or psychiatric treatment given in a hospital setting. Its use or the use of any other appellation cannot alter the unalterable fact that the only " treatment " employed is education molded to fit the needs and the capacity of the delinquent or exceptional child.

Nor can the use of *any* word change the undeniable fact that the buildings intended to be erected by W will be *used* exclusively for education and the educational process. We must be ever mindful that a zoning ordinance is concerned only with the actual use to be made of property and with the regulation of that actual use, and not with the owner's ultimate goals or benefits or profits which he hopes to derive from such use — even though such goals, benefits and profits are his primary inspiration or purpose for his proposed use of the property.

Indeed, the same charge, namely: that the primary or real purpose is one *other than* education may be leveled against all schools, colleges and seminaries, including the West Point Military Academy and the Annapolis Naval Academy. For the primary or ultimate purpose of all of them is to habilitate (i.e., to make able, as contrasted with rehabilitate — to make able again) every student, so that upon graduation he will be qualified to take his rightful place in society. But here again the decisive fact is that to achieve their respective primary objectives and their respective ultimate goals, they *all* employ the same common medium: education and the educational process.

It may be observed that if all the delinquent or "bad" boys at W had remained dispersed in the various public schools and there had received exactly the same kind of instruction and "treatment" as at W, none would dare question the status of the public school or assert that it had ceased to exist as a school or claim that the "bad" boys were not receiving the very education prescribed by law. Surely, it should make no difference just because the "bad" boys are "segregated in a twenty-four hour school so that they may be trained in a carefully controlled environment" through the concerted efforts or teamwork of the expert teachers assigned by the City Board of Education and the expert staff assembled by W (cf. Educational Psychology, Crow & Crow, 1948, pp. 571–572). In fact, the Zoning Ordinance here recognizes such a 24-hour school use, since it expressly permits the erection of dormitories and it states that they shall be deemed to be "accessory buildings" to private and parochial schools (§ 440.185).

Both implicit and explicit in the Zoning Ordinance (cf. §§ 423, 440.181, 220) is its recognition of the principle that as long as a private school offers a "comprehensive curriculum of study similar to that of a public school", the private school shall be permitted, regardless of what other training it may offer. For a private school, a parochial school and a seminary are all grouped together with public schools as permitted uses (§ 423). The court may take judicial notice that a private school, a parochial school and a seminary — all in varying degrees — train, orient, direct and condition the student's mind toward the attainment of the special goal for which the school or seminary was founded. How far beyond the conventional teaching such an institution may go is best evidenced by the dictionary's common definition of a seminary as "a school or college where priests, ministers, etc. are trained".

With respect to the construction of a zoning ordinance, it has been said that: "It is a common experience that new times bring not only new problems but new ways and means of dealing with old ones" (*Dellwood Dairy Co.* v. *City of New Rochelle*, 7 N Y 2d 374, 375). Accordingly, it was there held that the sale of milk at a profit through a vending machine in the basement of an apartment house has become a proper accessory use to a residence use, and is not a prohibited business use. So here, whatever new or different methods may be utilized at W to inculcate a proper education to meet the needs of the delinquent or emotionally disturbed child, such methods are proper accessory uses; they are simply "new ways and means of dealing with old" problems and with the new problems generated

by the new times and by the constantly growing rate of juvenile delinquency and emotional disorders.

What was not a customary accessory use in yesteryear has inexorably become one today. Just as the automotive bus has displaced the horsecar and the horseless trolley, as the jet airplane has displaced the conventional plane, and as the rocket-propelled missile has displaced the old cannon fire, so here the new educational group methods of training the whole child, and particularly the whole *problem* child, have displaced the conventional methods of education.

Hence, even if it be assumed that these new methods of educating problem or exceptional children are not strictly educational, they surely have become *customary accessory uses* for their proper education. The State of New York, the City of New York, and every recognized authority in education treat these new methods as integral parts of the education of the abnormal or exceptional child.

In this respect the modern concept of education coincides with the modern broad concept of a church or synagogue. Thus, a Catholic church has been held to embrace not only the church proper but also as accessory uses: the convent or sisters' home, the priests' mansion and a school (*Matter of Diocese of Rochester* v. *Planning Bd. of Town of Brighton,* 1 N Y 2d 508, 526). A synagogue has been held to embrace not only the house of prayer but also as accessory uses: (1) a place for religious teaching, (2) a place for a men's club and a sisterhood to promote social fellowship, (3) a place for a junior age group, and (4) a place for the rendition of services for the Boy Scouts and the Red Cross (*Matter of Community Synagogue* v. *Bates,* 1 N Y 2d 445, 452–453).

In a comparatively recent case (*Rogers* v. *Association for Help of Retarded Children,* 308 N. Y. 126, 129–135, *supra*), the court went even further when it held that under the local zoning ordinance an institution in Westchester County which admittedly used its premises for the care and convalescence of children afflicted with cardiac conditions, was nonetheless a school, since the children at the same time had received regular instruction from teachers employed by the City of New York.

In the *Rogers* case, the ordinance permitted the continuance of a nonconforming use by a new owner, provided that he continued the same prior nonconforming use. The original owner, the Pelham House for Children, Inc., had used the property for the care and convalescence of children with cardiac conditions. In conjunction with such care and convalescence, the children were taught by the New York City teachers. The new owner,

the Association for the Help of Retarded Children, Inc., proceeded to use the property as a day school exclusively, for the education of retarded children; the new owner did not administer any medical care. It claimed nevertheless that its exclusive day educational use was a continuation of the prior nonconforming use.

The majority of the court (in the *Rogers* case) held in effect that the prior dual nonconforming use (care and education) by the prior owner was essentially or primarily the same as the school use by the new owner, because (as stated by them): '' In our view it cannot be argued successfully that the care of convalescent children does not include their education, the fact being that the Legislature has ordained their education to be compulsory (see Education Law, art. 65). As to plaintiff's claim that the use to which the prior owner put the property had been a convalescent home and not a school, we think the argument disregards both the statutory requirement last cited above, and the strong public policy of the State which favors the education of all children, however handicapped '' (p. 132).

A fortiori, in the case at bar it must be held that W is a school. For here, apart from and beyond the regular curriculum of education furnished by the New York City school teachers, the care furnished by W's own staff consists *entirely* of teaching, training and instructing the delinquent and the emotionally disturbed children in all *the extra-curricular subjects* (including remedial reading), and of molding such subjects to their special needs; thereby supporting the '' strong public policy of the state, which favors the education of all, however handicapped ''. In other words, W goes '' all out '' to completely educate all its boys just because of their deficiencies, their problems and their greater needs.

A very recent Maryland case goes so far as to place on a parity with a public school every State training school for delinquent minors (*State Bd. of Public Welfare* v. *Myers,* decided July 1, 1960, Circuit Court of Baltimore City, printed in the *Daily Record* of Baltimore, July 11, 1960, affd. 224 Md. 246).

In the *Myers* case, Robert Myers, a 13-year-old Negro boy, had been adjudged delinquent under Maryland's Children's Court Act, which is very much the same as New York's. He was remanded to Boys' Village, one of Maryland's four training schools for delinquent boys. The Boys' Village school, however, was for Negro boys exclusively, being operated on a segregated basis pursuant to statute. Myers sued to declare the statute invalid on the ground that segregation in schools is

unconstitutional by virtue of the decision of the Supreme Court of the United States (*Brown* v. *Board of Educ.*, 347 U. S. 483, *supra*). The underlying question thus squarely posed for decision by the Maryland court was whether a State training school to which delinquent boys are remanded for rehabilitation is, in fact, a school.

In a lengthy and learned opinion the trial court (in the *Myers* case) held that the State training school was still a school. It pointed out that the training school's use of a combination of special techniques and special guidance, administered by a group of specialists, could not change the basic fact that the delinquent child was actually receiving an education in a school. The court said:

"The use of social case work, psychology, psychiatry, vocational training and character-building recreation as auxiliary tools by the training school in its over-all program of rehabilitative education parallels their widespread use throughout Maryland's system of public education. * * * Grouped together in the Division for Special Services, they [the visiting teachers, the social workers, the psychiatrists, the psychologists and a clinical specialist] diagnose the problems of hundreds of maladjusted students with anti-social behavior patterns. The use of these important adjuncts and tools has become standard practice in all schools, including our public training schools. They do not transform either into some other type of institution.

"Public education is designed for all children in our communities — the normal child, the gifted child, the slow learner, the emotionally unstable, and the delinquent youth. Nothing in the differing curricula or specialized educational techniques employed in any of these various types of schools emasculates them as educational institutions or strips them of their essential identity as schools set up by the State or municipal governments at public expense."

On substantially the grounds thus stated, the trial court's decision was affirmed by the Court of Appeals of Maryland on February 7, 1961 (224 Md. 246).

There is another equally cogent reason for holding that W is a school: a contrary holding would at once undermine the Legislature's beneficent purpose in enacting the several Children's Court Acts pursuant to the constitutional authorization (N. Y. Const., art. VI, § 18).

It must be remembered that half the boys in W are there by commitment of the Judges of the Children's Court of the City of New York after an adjudication that they are delinquent or neglected. The statute governing that court expressly provides

(Domestic Relations Court Act of City of New York, § 84) that no adjudication thereunder " shall operate as a disqualification of any child subsequently to hold public office *or as a forfeiture of any right or privilege* * * *; and no child shall be denominated a criminal by reason of such adjudication, nor shall such adjudication be denominated a conviction." (Emphasis supplied.)

The statute also contains the significant provision that it " shall be construed to the end that the care, custody and discipline of the children brought before the court *shall approximate as nearly as possible that which they should receive from their parents, and that as far as practicable they shall be treated not as criminals but as children in need of aid, encouragement and guidance* " (§ 89; emphasis added).

Corresponding provisions are contained in the Children's Court Act of the State of New York (§ 45, subds. 4, 8), which is applicable to the counties outside of New York City. That act contains, in addition, a provision directing the court to " seek the co-operation of all societies or organizations, public or private, having for their object the protection or aid of children, to the end that the court may be assisted in every reasonable way to give the child within its jurisdiction such care, protection and assistance as will best conserve its welfare " (§ 37).

It should also be noted that by a recent special enactment the State has obligated itself to reimburse every public welfare district for one half the amount expended by it for the care and maintenance of every local juvenile delinquent pursuant to directions of the children's courts (Social Welfare Law, § 409 [L. 1955, ch. 604, as amd. by L. 1960, ch. 317]).

Construing the Children's Court Act of the State of New York, the Court of Appeals has said (*People* v. *Lewis*, 260 N. Y. 171, 176–177) that: the " concept of crime and punishment disappears. To the child delinquent through the commission of an act criminal in its nature, the State extends the same aid, care and training which it had long given to the child *who was merely incorrigible, neglected, abandoned, destitute or physically handicapped.* * * * The legislative intent is made as plain as language can make it. * * *. The State was not seeking to punish a malefactor. It was seeking to salvage a boy who was in danger of becoming one. * * * ' The problem for determination by the judge is * * * what had best be done in his [the boy's] interest and in the interest of the state to save him from a downward career.' (23 Harvard Law Review, 104, 119, " The Juvenile Court," by Julian W. Mack). ' " [Emphasis added.]

The purpose of the Children's Court Acts was "benign and protective"; it "was to create instrumentalities for the protection and rehabilitation of children" (*People* v. *Shannon*, 1 A D 2d 226, 230; *Matter of "Robles*," 193 Misc. 870, 871). This benign purpose is best accomplished, said the late Judge MACK (U. S. Circuit Court Judge, Second Circuit), a noted and quoted authority on juvenile delinquency, by taking the child in hand " and instead of first stigmatizing and then reforming it, to protect it from the stigma" by having the State, through the court, exercise its power as *parens patriæ* and provide for the education of the child in " *a real school* " and not in an institution which savors of a reformatory or prison; every effort must be taken to avoid any resemblance to crime or punishment (23 Harv. L. Rev. 104, 109, 114–115, 119). As so eloquently stated by Judge MACK:

"If a child must be taken away from its home, if for the natural parental care that of the state is to be substituted, *a real school, not a prison in disguise, must be provided.* Whether the institutional life be only temporary until a foster home can be found, or for a longer period until the child can be restored to its own home or be given its complete freedom, the state must, both to avoid the constitutional objections suggested by the Turner case [*People ex rel. O'Connell* v. *Turner*, 55 Ill. 280], and in fulfilment of its moral obligation to the child, furnish the proper care. This cannot be done in one great building, with a single dormitory for all of the two or three or four hundred or more children, in which there will be no possibility of classification along the lines of age or degrees of delinquency, in which there will be no individualized attention. What is needed is a large area, preferably in the country, — because these children require the fresh air and contact with the soil even more than does the normal child — laid out on the cottage plan, giving opportunity for family life, and in each cottage some good man and woman who will live with and for the children. Locks and bars and other indicia of prisons must be avoided; human love, supplemented by human interest and vigilance, must replace them. In such schools there must be opportunity for agricultural and industrial training, so that when the boys and girls come out, they will be fitted to do a man's or woman's work in the world, and not be merely a helpless lot, drifting aimlessly about.

"Some states have begun to supply this need. But despite the great ultimate financial saving to the state through this method of dealing with children, a saving represented by the value of a decent citizen as against a criminal, *the public*

*authorities are nowhere fully alive to the new obligations that the spirit as well as the letter of this legislation imposes upon them.''* [Emphasis added.]

It thus becomes self-evident that the Legislature's purpose in enacting the several Children's Court Acts would be thwarted if W, half of whose boys are there by commitment of Judges of the Children's Court of the City of New York, were held to be *not* a school but some sort of a medical treatment center for emotionally sick boys or some sort of a reformatory for the correction of delinquent boys. The result would be (as it already has been here) to place upon all the boys the very stigma which the Legislature was so anxious to avoid and which the statutes were designed to prevent. The boys immediately would be stamped as outcasts and would be ostracized as human derelicts; the essential prop on which their rehabilitation rests would be gone; their commitment will have caused them to forfeit a most valuable statutory '' right or privilege '' to attend '' a real school ''; to live in an atmosphere resembling '' as nearly as possible '' the parental home; and to be treated as children '' in need of aid, encouragement and guidance.'' Indeed, their confinement in any place other than a real school may well be deemed a civil disability which deprives them of their constitutional right to attend school (cf. *State Bd. of Public Welfare* v. *Myers,* 224 Md. 246, *supra*).

The town's opposition to W appears to be motivated by the mistaken notion that these unfortunate infants are nothing more than a hybrid lot of criminals or psychotics, and that as such they must be shunned at all costs. Such a provincial and medieval attitude, if given legal sanction, would impose *en masse* upon all the '' children's court boys '' at W the very disabilities and stigma which the State, by the Children's Court Acts, has commanded shall not be imposed upon *any one* of them; and would deprive them *en masse* of rights and privileges which the State has declared shall remain inviolate *as to each* of them. The courts should strive to avoid any construction of the Zoning Ordinance which brings about such a harsh result and such an unintended subversion of the State's public policy.

In my opinion, the Zoning Ordinance, reasonably and fairly construed, by its terms permits the operation of a school like W. Accepting the language as written, the ordinance expressly permits the operation in a residence zone of any private boarding school which offers a '' comprehensive curriculum of study similar to that of a public school.'' That is the only criterion stated in section 440.18 of the ordinance; that is the sole test; W meets it. Since the ordinance makes no distinction as to

the type of school, the court should not undertake to do so by, in effect, rewriting the ordinance so as to exclude W.

If it be assumed, however, that the ordinance is ambiguous, then the ambiguity still must be resolved in W's favor. The rules are well established: In case of doubt or ambiguity a zoning ordinance must be "strictly construed in favor of the landowner"; the restrictions imposed by the ordinance "may not be extended by any administrative board or judicial tribunal in order to exclude a use which *in its opinion* should have been excluded"; the provisions of the ordinance "may not be extended by implication"; and it "should be strictly construed against the prohibition of an otherwise lawful use" (*City of Buffalo* v. *Roadway Tr. Co.*, 303 N. Y. 453, 461–462; *Matter of Westchester County S. P. C. A.* v. *Mengel*, 292 N. Y. 121, 124; *Matter of Monument Garage Corp.* v. *Levy*, 266 N. Y. 339, 344; *Matter of Glenel Realty Corp.* v. *Worthington*, 4 A D 2d 702, 704; *Matter of Barbara Homes* v. *Michaelis*, 14 Misc 2d 620, 621).

These rules are simply corollaries to the broader general rules governing the interpretation of restrictive covenants affecting realty. It is well settled that in case of doubt "restrictive covenants must always be construed strictly against those seeking to enforce them; that they must be construed as they read and not be given a construction extending beyond the literal meaning of their terms"; that "[T]he law favors the free and unobstructed use of property, and &ast; &ast; &ast; that, if a restrictive covenant is capable of more than one interpretation, it will be construed against the party who is endeavoring to extend it"; and that "doubts and ambiguities must be resolved in favor of the natural right to the free use and enjoyment of property and against restrictions" (*Premium Point Park Assn.* v. *Polar Bar*, 306 N. Y. 507, 512; *Buffalo Academy of Sacred Heart* v. *Boehm Bros.*, 267 N. Y. 242, 249; *Schoonmaker* v. *Heckscher*, 171 App. Div. 148, 151, affd. 218 N. Y. 722).

It is inconceivable that an institution such as W should be declassified and degraded as a school just because the very totality of its educational process has made it pre-eminently successful in rehabilitating the impoverished, delinquent and maladjusted children who cannot respond to the conventional methods, who cannot progress in the traditional schools and who cannot afford the luxury of attending other private schools with adequate special facilities for their special needs.

If, despite all of the foregoing, it should nevertheless be held that W's proposed use will not be for a school within the meaning of the Zoning Ordinance, but will be primarily for the charitable purpose of "treatment and rehabilitation of delin-

quent or maladjusted boys," then the conclusion would logically follow that under the ordinance W must be excluded from all of Yorktown, since: (a) the ordinance expressly prohibits every use not specifically permitted (§ 423); and (b) Wiltwyck, not having "existed" in Yorktown prior to January 6, 1959, is now foreclosed, by reason of the amendment to the Zoning Ordinance, from claiming or asserting any right as a charitable institution to use its land for a charitable purpose—a use which was expressly permitted prior to the amendment. That, in effect, is the position of the town. Indeed, on the trial its principal zoning expert urged that W could find legal refuge in other communities whose zoning laws are less onerous.

Here, however, this conclusion and this result must be rejected because—assuming that W's proposed use will not be for a school, then, as applied to W's charitable endeavors to rehabilitate delinquent and maladjusted boys, the Zoning Ordinance and its amendment are void; they violate the Constitution, the public policy of the State and the statute which empowers the town to adopt zoning regulations (Town Law, § 263).

Whatever difference of opinion may exist as to W's proper classification, all freely admit that W is doing a noble work of charity; and all join in its praise. As an institution devoted to the maintenance, care and nurture of delinquent, dependent and neglected boys, none can gainsay that W is not only doing a work of charity, but that it is also furthering the public policy of the State to adequately provide for all such children. That policy is ordained by the Constitution, not once, but several times (N. Y. Const., art. VI, § 18, art. VII, § 8, art. XVII, § 2); and that policy has been implemented: (a) by the numerous statutory enactments contained in the Children's Court Acts, the Education Law and the Social Welfare Law; and (b) by the State's financial support.

Accepting then, as the Special Term and as the majority of this court have, the town's classification of W, it must follow that the town by its adoption and amendment of the Zoning Ordinance, and that its officials by their decisions construing it, have effectively thwarted and subverted the State's fundamental public policy to provide for the support and welfare of delinquent and neglected children. For if Yorktown may bar W, so may every other municipality in the State.

The direct effect of such ordinance (as amd.) and of such decisions is: (1) to override and set at nought the State's public policy in matters just as vital as education and just as sacrosanct as religion; and (2) to violate the statute (Town Law, § 263) which requires that zoning shall "promote health and

general welfare" and shall "facilitate * * * public requirements."

With respect to a church, a synagogue and a public or private school, it is now well established: (1) that every zoning ordinance is unconstitutional if, by its terms or by its interpretation, it has the effect of prohibiting, *within a residence zone* in a municipality *or within the entire municipality,* the use of land for such a purpose; and (2) that, in any event, such a zoning ordinance is invalid because an ordinance which has the effect of excluding a church, a synagogue or a school from a residence zone or from a town or village is obviously not one which bears " any substantial relation to the promotion of the public health, safety, morals or general welfare of the community," as required by the statutes delegating the zoning power to local municipalities (*Matter of Community Synagogue* v. *Bates,* 1 N Y 2d 445, 452–453, 458, *supra; Matter of Diocese of Rochester* v. *Planning Bd. of Town of Brighton,* 1 N Y 2d 508, 521–526, *supra; Matter of Concordia Collegiate Inst.* v. *Miller,* 301 N. Y. 189, 192–197; *Long Is. Univ.* v. *Tappan,* 202 Misc. 956, 960, affd. 281 App. Div. 771, affd. 305 N. Y. 893).

Such invalidity has been extended so as to apply to a zoning ordinance which excludes a public beach or public park, on the ground: (1) that such uses " have come to be regarded as essential to the health and welfare of the community"; and (2) that any such ordinance bears no substantial relation to a proper zoning purpose, since it violates the State statute which requires that zoning shall promote the welfare and general welfare of the people and shall " ' facilitate the adequate provision of * * * schools, *parks* and other public requirements ' " (*Incorporated Vil. of Lloyd Harbor* v. *Huntington,* 4 N Y 2d 182, 191; cf. Village Law, § 177; cf. Town Law, § 263).

If, by its zoning ordinance forbidding the erection of schools or churches or synagogues or public beaches or public parks, a municipality cannot thwart the State's policy as to education, religion, beaches and parks, surely it should not, by a zoning ordinance forbidding W's charitable use, be permitted to subvert the State's policy, established by Constitution and statute, to provide for the welfare of delinquent, dependent and neglected children. For none can deny that, even more than education or religion or beaches or parks, the protection and care of helpless children between 8 and 12 years old " is clearly in furtherance of the health, safety, morals and general welfare of the community, and is under the direct supervision, care and concern of the State itself " (cf. *Matter of Concordia Collegiate Inst.* v. *Miller, supra,* 301 N. Y. 189, 195–196; cf. *Incorporated Vil. of*

*Lloyd Harbor* v. *Huntington,* 4 N Y 2d 182, 191, *supra*). The best proof of this fact is that both the State and the City of New York are the major financial support of W, and that in the fiscal year ending June 30, 1959 they have "given Wiltwyck a little over a half-million dollars."

Time and again, it has been declared: (1) that a policy of the State as prescribed in the Constitution or as enunciated by the Legislature may not be abrogated, ignored, thwarted, subverted, circumvented or superseded by any enactment or action of a municipality, unless the municipality has been empowered so to do, in terms clear and explicit, by the Constitution or the Legislature; and (2) that the grant of such a paramount power is *never* to be inferred or assumed from the grant of a general power, such as the power to adopt a zoning ordinance (cf. *F. T. B. Realty Corp.* v. *Goodman,* 300 N. Y. 140, 148; *People* v. *County of Westchester,* 282 N. Y. 224, 232; *Matter of Niagara Mohawk Power Corp.* v. *City of Fulton,* 8 A D 2d 523, 527; *Jewish Consumptives' Relief Soc.* v. *Town of Woodbury,* 230 App. Div. 228, 234–238, affd. 256 N. Y. 619; *Matter of Cons. Edison Co. of N. Y.* v. *Village of Briarcliff Manor,* 208 Misc. 295, 300–302; *Matter of Tartaglia* v. *McLaughlin,* 190 Misc. 266, affd. 273 App. Div. 821, revd. on other grounds 297 N. Y. 419; *People ex rel. Elkind* v. *Rosenblum,* 184 Misc. 916, 919–921; *Village of Fleischmanns* v. *Hyman,* 164 Misc. 175, 178–179).

As stated, the direct effect of the town's amended Zoning Ordinance and of the decisions construing it, is to exclude from the town a function which the State has expressly authorized and which it financially supports. A town, by its regulations, may not "forbid that which the State has specifically permitted" (*Matter of Kress & Co.* v. *Department of Health,* 283 N. Y. 55, 59). Nor may a town do so indirectly, as by the regulation or control of its streets or property (*Good Humor Corp.* v. *City of New York,* 264 App. Div. 620, 626, affd. 290 N. Y. 312); or by action under a zoning ordinance which has the effect of "an unqualified prohibition" *in the whole town* of the State-authorized function (cf. *Jewish Consumptives' Relief Soc.* v. *Town of Woodbury,* 230 App. Div. 228, 235, affd. 256 N. Y. 619, *supra*).

Accordingly, it must be held that if W is not a school within the meaning of the Zoning Ordinance, but is an institution for the care, nurture and rehabilitation of delinquent, dependent and neglected children, then the Zoning Ordinance as applied to it: (a) is unconstitutional because it thwarts and circumvents the deep-rooted State policy to provide for such children; and (b) is invalid because it violates section 263 of the Town Law,

in that it impairs rather than promotes the '' health and general welfare,'' and in that it retards rather than facilitates '' the adequate provision of   *   *   *   public requirements ''.

The principal case on which the town and the majority of this court rely (*Matter of Jewish Mental Health Soc.* v. *Village of Hastings,* 243 App. Div. 707, affd. 268 N. Y. 458, remittitur amd. 269 N. Y. 562, appeal dismissed 297 U. S. 696), is neither controlling nor decisive here. There the Court of Appeals, in two short sentences, simply stated that the evidence sustains the findings that plaintiff operated an insane asylum and that '' in the circumstances the zoning ordinance is a valid exercise of authority reasonably conferred for the general welfare '' (p. 461). These general statements do not disclose the basis for the court's decision.

However, an examination of the decision in this court in the *Hastings* case (243 App. Div. 707) and an examination of the records and briefs in the *Hastings* case (on the appeal in this court and in the Court of Appeals), disclose the following facts: (1) that the plaintiff there operated a mental hospital as a continuation of a prior nonconforming use; (2) that plaintiff's property was in a residential zone in which a mental hospital was a prohibited use under the zoning ordinance; (3) that the zoning ordinance also prohibited the enlargement of a nonconforming use; (4) that plaintiff sought to enlarge its nonconforming use by erecting additional buildings without regard to section 343 of the Village Law, which provides that a building in a village shall not be used as a hospital '' for the   *   *   *   care of public or private patients without the consent of the board of health of such village ''; (5) that this section of the Village Law was held to be applicable; (6) that plaintiff had failed to obtain the consent required under said section; (7) that the denial of the building permit for the new buildings was upheld largely, if not entirely, on the ground that plaintiff had failed to obtain such consent (cf. 243 App. Div. 707); (8) that said section 343, which was attacked as an unconstitutional delegation of power, was held to be constitutional; (9) that such constitutional delegation of power by section 343 clearly denoted the State's intention to make the erection and use of any future hospital subject to the local zoning ordinance; (10) that under the zoning ordinance the hospital use was excluded only from the residential zone, not from the whole village; (11) that the hospital could be erected in other zones in the village upon obtaining the consent of its Board of Health under section 343 of the Village Law; and (12) that under the circumstances the zoning ordinance was not, as contended by the plaintiff, '' repugnant '' to

section 1 of the 14th Amendment of the Constitution of the United States (cf. 269 N. Y. 562).

The foregoing facts readily distinguish the *Hastings* case from the case at bar. Here, W is excluded from all of Yorktown, while there the hospital was not excluded from the whole village; here the permission of the local Board of Health is not required as it was there; here there is no provision of the Town Law corresponding to section 343 of the Village Law to bolster the validity of Yorktown's exclusion of W; and, even more important, *here the town is attempting to subvert the State's fundamental public policy to aid and to educate the delinquent, the neglected and the emotionally disturbed helpless children.*

Accordingly, the orders of the Special Term should be reversed, the determination of the Zoning Board of Appeals and the decision of the building inspector should be annulled, and the building inspector should be directed to issue the building permit to W, on the ground that, upon the undisputed and uncontradicted facts, it must be concluded as matter of law: (1) that W's proposed use of its land will be for a private boarding school within the express language of the Zoning Ordinance; or (2) that, if W does not qualify as a private boarding school, then the Zoning Ordinance as applied to its proposed *future* use is unconstitutional and invalid; and (3) that in either event the determination of the Zoning Board and the decision of the building inspector were arbitrary and capricious and may not be sustained.

NOLAN, P. J., BELDOCK, CHRIST and BRENNAN, JJ., concur in *Per Curiam* opinion; KLEINFELD, J., dissents and votes to reverse both orders, to annul the determination of the Zoning Board and the decision of the building inspector, and to direct the issuance of a building permit to petitioner.

Orders affirmed, without costs.